# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket No. 34461

IN RE:  UNIVERSITY PLACE/IDAHO )
WATER CENTER PROJECT. )          Boise, September 2008  Term
_____ )
THE UNIVERSITY OF IDAHO )          2008 Opinion No.  121
FOUNDATION, INC., )
) Filed: December 10, 2008
Plaintiff-Appellant, )
) Stephen W. Kenyon, Clerk
v. )
)
CIVIC PARTNERS, INC., CIVIC )
PARTNERS WEST LLC, CIVIC )
PARTNERS IDAHO LLC, and CAPITAL )
CITY DEVELOPMENT CORPORATION, )
)
Defendants-Respondents. )
_____ )

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, in and for Ada County.  The Hon. Daniel C. Hurlbutt, District Judge.

The judgment of the district court is <u>affirmed</u>.

Skellenger Bender, P.S., Seattle, and Clements, Brown & McNichols, P.A., Lewiston, for appellant.  Michael E. McNichols argued.

Stoel Rives LLP, Boise, for respondents Civic Partners, Inc., Civic Partners West LLC, and Civic Partners Idaho LLC.  J. Walter Sinclair argued.

Perkins Coie LLP, Boise, for respondent Capital City Development Corporation. Christine Salmi argued.

_____

EISMANN, Chief Justice.

This is an appeal from a partial judgment holding that the University of Idaho Foundation is obligated to make payments under a contract between it and Civic Partners Idaho, LLC, and from the award of costs and attorney fees to the Capital City Development Corporation.  We affirm the judgment of the district court and award attorney fees on appeal to the Capital City Development Corporation.

# I. FACTS AND PROCEDURAL HISTORY

In 1990, Ada County acquired a fourteen-acre parcel of land for a new courthouse. The parcel is commonly called the "Ada County Courthouse Corridor" (Corridor) and is located within the urban renewal district managed by the Capital City Development Corporation (CCDC), which is the urban renewal agency for Boise, Idaho. Ada County and the CCDC entered into a master ground lease under which the CCDC leased the entire Corridor for a term of ninety-nine years. The CCDC also contracted to develop the land in the Corridor. Ada County and CCDC selected Civic Partners, Inc. (Civic Partners), as the real estate developer for the entire project, which included the construction of the courthouse and adjacent parking facilities on the western portion of the Corridor and the private development of land east of the courthouse site.

The Corridor was divided by Avenue A into a ten-acre parcel west of Avenue A and a four-acre parcel east of Avenue A. The four-acre site was commonly called the "Avenue A Site." Ada County and the CCDC decided that the Avenue A Site should be developed separately from the remainder of the Corridor. They separated that site from the master ground lease, and on October 5, 2000, Ada County leased the Avenue A Site to the CCDC for ninety-nine years under what the parties called the "Surplus Ground Lease." The CCDC intended to sublease the Avenue A Site to Civic Partners Idaho, LLC (Civic Idaho), who was to develop it. The Avenue A Site was divided into several parcels, one of which was designated "Parcel 1."

The University of Idaho Foundation, Inc. (Foundation), had acquired property located south of the Corridor on which it intended to construct the Idaho Water Center (Water Center) to be used by the University of Idaho. It later decided that it wanted the Water Center to be located within the Corridor on Parcel 1. As a step towards accomplishing that, Civic Partners, Civic Idaho, Civic Partners West, LLC (Civic West), and the Foundation executed a document entitled "Memorandum of Understanding Pending Final Agreement Negotiations" (Memorandum of Understanding), which became effective on April 1, 2001. They agreed in principle, among other things, that Civic West would develop the Water Center on a portion of Parcel 1 designated as Unit 101 and that the Foundation would sub-sublease Parcel 1 from Civic Idaho.

The planned development of the Corridor included a multi-family housing project. The CCDC intended to construct an underground parking facility that would serve both the housing

project and Parcel 1. Construction of that parking facility would be financed, in part, with a portion of the increased tax revenues resulting from increases in the assessed values of property in Parcel 1. If that property was owned or occupied by a tax-exempt entity, Civic Idaho was obligated to make payments in lieu of taxes to the CCDC equal to the amount of the lost tax revenues. Therefore, the Memorandum of Understanding provided that the Foundation, which is a tax-exempt entity, would make certain payments, including an "Annual Contribution" of $350,000 for thirty years to help pay for parking and other infrastructure improvements. The Memorandum also provided that the Foundation could terminate it upon three days written notice, but it would be liable for certain costs incurred by Civic Partners, Civic West, and Civic Idaho, which are collectively referred to as the "Civic Entities."

The Foundation desired to finance the construction of the Water Center through the Idaho State Building Authority (ISBA), but the ISBA would not do so unless it owned the land and was the developer. Also, it would not purchase Unit 101 if that land was obligated to make the Annual Contribution for parking.

In the summer of 2002, the Foundation terminated the Memorandum of Understanding and Civic West as the developer. In order to conclude their relationship, the Foundation and the Civic Entities entered into a "Memorandum of Understanding, Reconciliation Agreement" (Reconciliation Agreement), which had an effective date of July 31, 2002. The Agreement contained various provisions, including the following:

(a) Section 2.5 of the Agreement provided that the parties would work together to secure the commitment of the owner and/or tenants of the Water Center to pay an "Annual Contribution" of $350,000 for thirty years. It also provided that the amount of the Annual Contribution could be reduced proportionally if the Forest Service or other tax-paying owners or tenants occupied space in Unit 101 and that it could be reduced by any parking access fees paid to the CCDC by owners or tenants of Unit 101, other than the CCDC's customary fees for monthly or transient parking.

(b) The last sentence in Section 2.5 of the Reconciliation Agreement provided:

> If financing for the Housing Project closes by March 1, 2003 and the Foundation transfers Unit 101 to ISBA prior to September 1, 2003, Unit 101 shall not be subject to any binding obligation to pay the Annual Contribution, but the Foundation shall commit to the Civic Entities to pay the Annual Contribution.

3

(c) Section 2.1 of the Agreement provided that upon the closing of the housing project, the Foundation and Civic Idaho would enter into a sub-sublease of Parcel 1 as described in Exhibit B attached to the Reconciliation Agreement. Exhibit B acknowledged that the sub-sublease had not yet been drafted. The Exhibit recited that the current draft of the Avenue A Sublease,[1] which had not yet been executed by the CCDC and Civic Idaho, would require the Civic Entities to make payments in lieu of taxes if any portion of Parcel 1 was leased to a tax-exempt entity. The exhibit stated that such obligation could be satisfied with respect to Unit 101 by a $2,500,000 payment and by payment of the Annual Contribution set forth in Section 2.5 of the Reconciliation Agreement.

(d) The Reconciliation Agreement also provided that the sub-sublease would provide for the future acquisition of Unit 101 by the ISBA for development of the Water Center.

After execution of the Reconciliation Agreement, Civic Idaho entered into four contracts with the CCDC and/or the Foundation, all of which had effective dates of October 1, 2002. Those contracts were as follows:

(1) Civic Idaho and the CCDC had previously entered into an agreement for the development of the Avenue A Site, and they amended that agreement pursuant to an "Amended and Restated Avenue A Disposition and Development Agreement." Under Section 116(H) of this Agreement, the CCDC agreed "to enter into a Parking Allocation Agreement with the owner or master tenant of Unit 101, as may be required pursuant to that Memorandum of Understanding Reconciliation Agreement, dated July 31, 2002."

(2) Civic Idaho and the CCDC entered into a Parcel 1 Sublease, which was approved by Ada County. The Sublease required Civic Idaho to pay all taxes levied against Parcel 1. In addition, it required Civic Idaho to pay "as Additional Rent, as supplemental taxes, the difference between the Taxes actually levied and the Taxes which would be levied if [Units 101, 102, 302A, and 302B] were privately owned." The supplemental taxes were, in effect, the same as the payments in lieu of taxes that Civic

---

[1] The draft Avenue A Sublease was never executed.

4

Idaho was required to pay the CCDC. The Sublease also provided, "Upon the assignment of this Parcel 1 Sublease to the Foundation, Developer [Civic Idaho] shall be released from all obligations under this Parcel 1 Sublease."

(3) The Foundation and Civic Idaho entered into a "Lease Assignment and Assumption Agreement" under which Civic Idaho assigned to the Foundation all of its right, title, and interest as the lessee under the Parcel 1 Sublease, and the Foundation assumed and agreed to perform all of the obligations of Civic Idaho under that Sublease. The Assignment also provided, "Except as expressly set forth herein, all terms and conditions of the Reconciliation Agreement shall remain in full force and effect." Ada County and the CCDC consented to the assignment and released Civic Idaho from all obligations under the Parcel 1 Sublease.

(4) The Foundation, Civic Idaho, and the CCDC entered into an "Agreement in Connection with the Assignment and Assumption of the Parcel 1 Sublease." By this Agreement, the parties agreed to "negotiate diligently and in good faith to amend and/or supplement the Parcel 1 Sublease to reflect the respective rights and obligations of the Foundation as set forth in the Reconciliation Agreement." The negotiations were to be completed prior to the acquisition of Unit 101 by the ISBA, but in any event not later than December 1, 2002. The Agreement also provided, "Except as expressly set forth herein, all terms and conditions of the Reconciliation Agreement shall remain in full force and effect."

On December 17, 2002, three other contracts were entered into by various parties involved in the Water Center project. They were as follows:

(1) The University of Idaho and the CCDC entered into a "Parking Access Agreement" under which the CCDC agreed to provide up to 200 annual parking passes to the University in exchange for the University making an Annual Contribution of $350,000 for thirty years. The Agreement also provided, however, that the University was only obligated to pay the Annual Contribution "to the extent that funds may be available for such . . . payment from state general appropriations or other funds legally available therefore."

5

(2) The Foundation, the CCDC, and Ada County entered into a "Transfer and Release Agreement" under which the County agreed to convey fee simple title of Unit 101 to the ISBA. This Agreement also provided upon the conveyance of Unit 101 to the ISBA, the Foundation, the CCDC, and Ada County "acknowledge and agree that Unit 101 will be released from and in no respect subject to the Surplus Ground Lease and the [Parcel 1] Sublease."

(3) Ada County and the ISBA entered into a "Unit 101 Acquisition Agreement" under which the County agreed to sell Unit 101 to the ISBA for $2,000,000. That sale was closed on January 9, 2003, and the ISBA owns Unit 101.

The Water Center was constructed on Unit 101, and it opened in September 2004.

On July 20, 2004, the Foundation filed this lawsuit against the Civic Entities alleging three causes of action: (1) a claim for damages for breach of the Reconciliation Agreement; (2) a claim for damages based upon unjust enrichment; and (3) a claim for a declaratory judgment that Foundation has no legal obligation to make the payments in lieu of taxes. The district court held that the CCDC was a necessary party because it was the payee of such payments and required the Foundation to add the CCDC as a party to the lawsuit. The Foundation then filed an amended complaint adding the CCDC, two law firms, and four named attorneys as defendants.

The only claim against the CCDC was the third cause of action seeking a declaratory judgment that the Foundation and the Civic Entities were not required to make the payments in lieu of taxes. The Foundation alleged: (a) the Foundation's only obligation under the Reconciliation Agreement was to secure the University of Idaho's commitment to make the payments; (b) the CCDC agreed to substitute the University as payor; (c) the CCDC agreed to allow the University to terminate the Parking Access Agreement for any reason; (d) neither the Civic Entities nor the Foundation have any obligation to make the payments on Unit 101; and (e) the substitution of the University for the Foundation by the CCDC and the release of the Civic Entities constituted a novation, eliminating any obligation of the Foundation to make the payments under the Reconciliation Agreement.

On May 4, 2006, the Civic Entities moved for a partial summary judgment dismissing the third cause of action in the amended complaint. The motion was argued, and on September 28, 2006, the district court issued a memorandum decision and order granting the motion.

6

On October 16, 2006, the Foundation moved for a partial summary judgment declaring the payments in lieu of taxes unconstitutional. On November 7, 2006, the Civic Entities responded with a motion for partial summary judgment declaring the payments legal. These motions were argued, and on February 9, 2007, the district court issued a memorandum decision and order denying the Foundation's motion and granting the Civic Entities' motion. The Foundation filed a motion for reconsideration, which, after oral argument, the district court denied in an opinion filed on June 28, 2007.

Both the CCDC and the Civic Entities requested awards of attorney fees in connection with the granting of summary judgment dismissing the third cause of action. The district court held that the CCDC, as the prevailing party on the claim made against it, was entitled to an award of attorney fees under Idaho Code § 12-120(3). It awarded the CCDC costs, including attorney fees, totaling $227,137.47. The court held that the Civic Entities' request for an award of attorney fees was premature, but once the remaining claims between the Civic Entities and the Foundation were resolved the court would consider that the Civic Entities had prevailed on the third cause of action when determining the prevailing party in the litigation pursuant to Rule 54(d)(1)(B) of the Idaho Rules of Civil Procedure. The court certified the judgment in favor of the CCDC as final pursuant to Rule 54(b), and the Foundation timely appealed.

## II. ISSUES ON APPEAL

1. Did the district court err in granting the partial summary judgment holding that the Reconciliation Agreement obligated the Foundation to pay Civic Idaho the Annual Contribution?

2. Did the district court err in finding that the Civic Entities were prevailing parties on the motions for partial summary judgment?

3. Did the district court err in ruling that the CCDC was entitled to an award of attorney fees under Idaho Code § 12-120(3)?

4. Did the district court abuse its discretion in determining the amount of the attorney fee award?

5. Did the district court abuse its discretion in its award of court costs to the CCDC?

6. Is any party entitled to an award of attorney fees on appeal?

## III. ANALYSIS

**A. Did the District Court Err in Granting the Partial Summary Judgment Holding that the Reconciliation Agreement Obligated the Foundation to Pay Civic Idaho the Annual Contribution?**

The district court held that the Foundation was obligated to pay the Annual Contribution set forth in Section 2.5 of the Reconciliation Agreement, which is $350,000 per year for thirty years, but could be reduced (a) proportionally if the Forest Service or other tax-paying owners or tenants occupied space in Unit 101 and (b) by any parking access fees paid to the CCDC by owners or tenants of Unit 101, other than the CCDC's customary fees for monthly or transient parking. The Foundation contends that the Reconciliation Agreement is not a binding contract because: (a) the contract was simply an agreement to agree; (b) the parties did not agree on all of its material terms; and (c) a condition precedent did not occur. The Foundation also contends that the district court erred in granting summary judgment because: (a) the Reconciliation Agreement was ambiguous and (b) the district court made credibility determinations when granting summary judgment. Each of these arguments will be addressed below.

**1. Was the Reconciliation Agreement simply an agreement to agree?** "Generally, an agreement to agree is unenforceable, as its terms are so indefinite that it fails to show a mutual intent to create an enforceable obligation. . . . No enforceable contract comes into being when the parties leave a material term for future negotiations, creating a mere agreement to agree." *Maroun v. Wyreless Systems, Inc.*, 141 Idaho 604, 614, 114 P.3d 974, 984 (2005) (quoting from 17A Am. Jur. 2d *Contracts* § 181 (2004).

First, the Foundation contends that its obligation to pay the Annual Contribution under the Reconciliation Agreement was dependent upon the CCDC agreeing what the amount of that contribution would be, and therefore the amount of the contribution was left to future negotiations with the CCDC. It reasons as follows. Section 2.1 of the Reconciliation Agreement provided, "Upon the closing of the financing for the Housing Project, the Foundation and Civic Idaho will enter into a Parcel 1 Sublease[2] described in Exhibit B . . . ." The first sentence of

---

[2] Civic Idaho had subleased Parcel 1 from the CCDC under a "Parcel 1 Sublease." In the Reconciliation Agreement, Civic Idaho agreed that it would sub-sublease Parcel 1 to the Foundation under what they also called a "Parcel 1 Sublease." The parties later decided that rather than having Civic Idaho sub-sublease Parcel 1 to the Foundation, the Foundation would be substituted for Civic Idaho as lessee under its Parcel 1 Sublease with the CCDC. On October 1, 2002, Civic Idaho and the Foundation entered into a "Lease Assignment and Assumption

8

Exhibit B noted that the Parcel 1 Sublease was actually a sub-sublease and that it had not yet been drafted. The second sentence stated that the Parcel 1 Sublease "will be in substantially the same form as the current draft of the Avenue A Sublease between CCDC and Civic Idaho . . . except as set forth in this Agreement and otherwise in a form mutually acceptable to the Parties . . . ." The draft of the Avenue A Sublease between the CCDC and Civic Idaho required Civic Idaho to pay supplemental taxes, but did not specify the amount of those payments. Thus, the amount of the Annual Contribution that the Foundation was required to pay under the Reconciliation Agreement was left for future negotiations with the CCDC.

The Foundation's reasoning is faulty. In the Reconciliation Agreement, Civic Idaho and the Foundation agreed, as between themselves, upon the amount the Foundation was obligated to pay as an Annual Contribution. The CCDC was not a party to the Reconciliation Agreement. Civic Idaho was taking a risk that the CCDC could demand that Civic Idaho pay more than the Foundation was obligated to pay Civic Idaho. The fact that Civic Idaho was willing to take that risk does not mean that the CCDC had to agree as to the amount that the Foundation was obligated to pay to Civic Idaho.

Next, the Foundation contends that the words "shall commit" in Section 2.5 of the Reconciliation Agreement should be given the same meaning as the words "elects to commit" in Section 4.2, and if they are then the amount of the Parking Contribution would be subject to future negotiations. The relevant portion of Section 2.5 and Section 4.2 are as follows:

> 2.5     . . . . If financing for the Housing Project closes by March 1, 2003 and the Foundation transfers Unit 101 to ISBA prior to September 1, 2003, Unit 101 shall not be subject to any binding obligation to pay the Annual Contribution, but the Foundation *shall commit* to the Civic Entities to pay the Annual Contribution. (Emphasis added.)

> 4.2     If the Foundation *elects to commit* to pay the Annual Contribution, the Foundation and the Civic Entities shall negotiate diligently and in good faith the terms and conditions of such commitment, consistent with the terms of this Agreement, and shall endeavor to have such commitment reduced to writing, through an amendment to the Parcel 1 Sublease or otherwise, not later than September 15, 2003. (Emphasis added.)

---

Agreement" (Lease Assignment) under which the Foundation was substituted for Civic Idaho as lessee. The Assignment also provided, "Except as expressly set forth herein, all terms and conditions of the Reconciliation Agreement shall remain in full force and effect."

9

Again, the Foundation's reasoning is faulty. Section 4.2 must be read in conjunction with other provisions of the Reconciliation Agreement, including Section 4.1. It provides:

> 4.1 If the financing for the Housing project has closed by March 1, 2003, then, not later than September 1, 2003, the Foundation shall notify Civic Idaho whether the Foundation will or will not commit to Civic Idaho, in writing, to pay the Annual Contribution, beginning on March 1, 2004; provided, however, the Foundation must make such commitment if Unit 101 is transferred to ISBA.

When these provisions are read together, Section 4.1 gave the Foundation the prerogative of deciding whether to commit to pay the Annual Contribution if the housing project closed by March 1, 2003, which it did. If, however, Unit 101 was transferred to the ISBA, the Foundation could no longer elect whether or not to make that commitment. It was obligated to do so.

This construction of Section 4.1 is consistent with Section 4.4 of the Reconciliation Agreement. It provides, "If the Foundation *elects*, *under Section 4.1 above*, *to commit to pay the Annual Contribution* (in the event the financing for the Housing Project closes by March 1, 2003) . . . , the Foundation shall have a period of 24 months, until September 1, 2004, to close the financing of the Idaho Water Center . . . ." (Emphasis added.) If Unit 101 were transferred to the ISBA, the Foundation would not need to get funding for the Water Center because it would be owned by the ISBA.

Section 4.2 only applies if the Foundation "elects to commit to pay the Annual Contribution." It does not apply if Unit 101 is transferred to the ISBA because at that point the Foundation no longer has the option of making or not making that election. It is obligated to commit to pay the Annual Contribution.

Finally, the Foundation argues that the "Agreement in Connection with the Assignment and Assumption of the Parcel 1 Sublease" shows that the parties had left terms of the Reconciliation Agreement open for further negotiations. On October 1, 2002, Civic Idaho and the Foundation entered into a "Lease Assignment and Assumption Agreement" (Lease Assignment) under which Civic Idaho assigned to the Foundation all of its right, title, and interest as lessee under the Parcel 1 Sublease between Civic Idaho and the CCDC, and the Foundation agreed to perform Civic Idaho's obligations under that Sublease. In the Lease Assignment, Ada County and the CCDC also released Civic Idaho from all of its obligations under the Parcel 1 Sublease. Contemporaneously with that assignment, Civic Idaho, the

10

Foundation, and the CCDC also entered into an "Agreement in Connection with the Assignment and Assumption of the Parcel 1 Sublease."[3] In that Agreement, the parties agreed to negotiate to amend the Parcel 1 Sublease that was now, as a result of the Lease Assignment, between the CCDC and the Foundation. The items listed for incorporation into the Sublease included, "The precise terms and conditions of the Annual Contribution (as defined and set forth in Section 2.5 of the Reconciliation Agreement)."

The Foundation asserts, "This document unequivocally demonstrates that both Civic [Idaho] and the Foundation knew that there were Parcel 1 Sublease terms relating to the Annual

---

[3] The "Agreement in Connection with the Assignment and Assumption of the Parcel 1 Sublease" included the following provisions:

> 1.     Amendment of Parcel 1 Sublease. The Parties agree that they will negotiate diligently and in good faith to amend and/or supplement the Parcel 1 Sublease to reflect the respective rights and obligations of the Foundation as set forth in the Reconciliation Agreement. Such amendment and supplement shall include, but not be limited to, provisions related to (to the extent not already incorporated into the Parcel 1 Sublease):
>
> > (a)     The acquisition of Unit 101 by the Idaho State Building Authority ("ISBA");
> > (b)     The scope and timing of the Foundation's development of Parcel 1, as set forth in Section 2.1 of the Reconciliation Agreement;
> > (c)     The terms and conditions of the covenant not to disturb as set forth in Section 2.1 of the Reconciliation Agreement;
> > (d)     The precise terms and conditions of the Annual Contribution (as defined and set forth in Section 2.5 of the Reconciliation Agreement);
> > (e)     The satisfaction of the obligations under Section 9.2(b) of the Parcel 1 Sublease (referred to as section 10.2(b) in the Reconciliation Agreement) through the $2,500,000 Infrastructure and Parking Contribution and Annual Contribution, as set forth in the second paragraph of Exhibit B to the Reconciliation Agreement;
> > (f)     The terms and conditions of the Foundation's right to use the offset credit set forth in Paragraph 3 of Exhibit B to the Reconciliation Agreement;
> > (g)     The terms and conditions of the Civic Entities obligations to enforce the parking and public infrastructure covenants by Agency [CCDC] will be employed and enforced for the benefit of Units 101 and 102 on equal footing with the remainder of the Corridor Parcels, as set forth in Paragraph 4 of Exhibit B of the Reconciliation Agreement;
> > (h)     The incorporation of licenses, easements and covenants as set forth in Paragraph 5 of Exhibit B to the Reconciliation Agreement; and
> > (i)     The establishment of a cooperative relationship between Developer and the Foundation for the development of the remainder of the Civic Plaza Condominium Project, as set forth in Paragraph 6 of Exhibit B to the Reconciliation Agreement.
>
> The Parties covenant and agree to use their best commercially reasonable efforts to complete the negations [sic] set forth in this Section 4 prior to the acquisition of Unit 101 by ISBA, but in any event no later than December 1, 2002.
>
> 2.     Reconciliation Agreement to Remain in Force. Except as expressly set forth herein, all terms and conditions of the Reconciliation Agreement shall remain in full force and effect.

11

Parking Contribution that had not yet been incorporated into any agreement between them." The Foundation's argument is contrary to the express terms of the Agreement.

The Agreement states, "The Parties agree that they will negotiate diligently and in good faith to amend and/or supplement the Parcel 1 Sublease to reflect the respective rights and obligations of the Foundation as set forth in the Reconciliation Agreement." It then lists various provisions to be considered for inclusion in the Parcel 1 Sublease, including, "The precise terms and conditions of the Annual Contribution (as defined and set forth in Section 2.5 of the Reconciliation Agreement)." The Parcel 1 Sublease could not be amended or supplemented to reflect "obligations of the Foundation as set forth in the Reconciliation Agreement" unless that Agreement contained obligations of the Foundation. One of such obligations listed was the Annual Contribution, "as defined and set forth in Section 2.5 of the Reconciliation Agreement." The Annual Contribution could hardly be an obligation of the Foundation that was "*defined and set forth* in Section 2.5 of the Reconciliation Agreement" if the parties had never reached an agreement regarding it.

**2. Did the parties fail to agree on a material term?** In order for a contract to be formed, there must be a meeting of the minds on all material terms to the contract. *Barry v. Pacific West Construction, Inc.*, 140 Idaho 827, 831, 103 P.3d 440, 444 (2004). The Foundation contends that the Reconciliation Agreement is not a binding contract because the parties had not reached agreement on a material term, which was the number of parking spaces to be provided to the Foundation. It argues, "Exhibit D to the MOU [Memorandum of Understanding] shows that the Foundation and Civic considered the number of parking stalls to be a 'material' term of the Parcel 1 Sublease under which the Annual Parking Contribution was to be paid."

The Memorandum of Understanding cannot be the basis for a claim that the number of parking spaces available to the Foundation was a material term of the Reconciliation Agreement. "If a written contract is complete upon its face and unambiguous . . . extrinsic evidence of prior or contemporaneous negotiations or conversations is not admissible to contradict, vary, alter, add to, or detract from the terms of the contract. A written contract that contains a merger clause is complete upon its face." *Howard v. Perry*, 141 Idaho 139, 141-42, 106 P.3d 465, 467-68 (2005). (Citation omitted.)

The Reconciliation Agreement included a merger clause.[4]   The Reconciliation Agreement also provided that it "terminates, supercedes and replaces the Memorandum of Understanding in all respects, and embodies the entire agreement between the parties with respect to the subject matter hereof and thereof."  Therefore, the Foundation cannot rely upon the provisions of the Memorandum of Understanding for its claim that the number of parking stalls available to it was a material term of the Reconciliation Agreement.

The Foundation contends that the Memorandum of Understanding can be considered, relying upon the following quotation from *J.R. Simplot v. Bosen*, 144 Idaho 611, 614, 167 P.3d 748, 751 (2006):

> The determination of the parties' intent is to be determined by looking at the contract as a whole, the language used in the document, the circumstances under which it was made, the objective and purpose of the particular provision, and any construction placed upon it by the contracting parties as shown by their conduct or dealings.

In making that argument, the Foundation overlooks the preceding sentence that puts the quotation in context.  "If the provisions of a contract are ambiguous, the interpretation of those provisions is a question of fact which focuses upon the intent of the parties."  *Id*.  The quotation relied upon by the Foundation only applies when the contract is ambiguous and parol evidence is admissible to determine the parties' intent.  Because the Reconciliation Agreement is not ambiguous, it does not apply to this case.

The Foundation also argues that Exhibit B to the Reconciliation Agreement "required Civic to put provisions into the Parcel 1 Sublease to ensure that CCDC would build parking facilities that would make the IWC [Water Center] 'commercially functional.'"  The Foundation asserts that there was no meeting of the minds as to how many parking spaces would be required to make the Water Center commercially functional.  This argument is unavailing for two reasons.

---

[4] Paragraph 11 of the Reconciliation Agreement stated as follows:

> Entire Agreement:  Exhibits.  This Agreement including the attached Exhibits, which Exhibits are incorporated into this Agreement, terminates, supercedes and replaces the Memorandum of Understanding in all respects, and embodies the entire agreement between the Parties with respect to the subject matter hereof and thereof.  The Parties acknowledge and agree that there are no other agreements or understandings among them, or between any of the Parties hereto, (whether written or oral) with respect to the subject matter hereof or thereof.

First, the Foundation misstates what Exhibit B required. Exhibit B described the Parcel 1 sub-sublease[5] that Civic Idaho and the Foundation intended to enter into upon the closing of the housing project. Exhibit B recited that the sub-sublease had yet to be drafted, but it described provisions that were to be in it. One of those provisions was as follows:

> The Parcel 1 Sublease shall contain appropriate obligations by the Civic Entities, as the developer of the balance of the Courthouse Complex Project and the Avenue A Project, as defined in the Surplus Ground Lease (collectively, the "Corridor Projects"), that the covenants made by CCDC that the parking and other public improvements to be constructed or financed by CCDC for the Corridor Project shall be adequate for such projects to be commercially functional, shall be employed and enforced for the benefit of Unit 101 and 102 on equal footing with the remainder of the parcels in the Corridor Projects.

The above-quoted provision does not require that the Civic Entities ensure that the CCDC provide the Foundation with enough parking spaces to make the Water Center commercially functional. The term "commercially functional" refers to covenants made by the CCDC that the parking improvements it constructs or finances for the Corridor Project will be adequate for projects constructed on Parcel 1 to be commercially functional. With respect to the Civic Entities, the above-quoted provision only required that the yet-to-be-drafted sub-sublease obligate them to make sure that the CCDC's covenants "shall be employed and enforced for the benefit of Unit 101 and 102 on equal footing with the remainder of the parcels in the Corridor Projects."

Indeed, when they executed the Reconciliation Agreement, the parties knew that the parking was to be under the control of the CCDC, not the Civic Entities. The Civic Entities would not have the authority to allocate parking spaces. As the Foundation states in its brief, "The ultimate terms for parking were not negotiated until the University (for whom the ISBA was building the WC [Water Center]) and CCDC entered into a Parking Access Agreement in December 2002." The CCDC would have to be a party to any agreement allocating parking spaces, and it was not a party to the Reconciliation Agreement.

---

[5] Exhibit B began, "The Parties acknowledge that the Parcel 1 Sublease (which is actually a sub-sublease) has not yet been drafted . . . ." It was a sub-sublease because Ada County leased Parcel 1 to the CCDC, and the CCDC subleased it to Civic Idaho. If Civic Idaho then leased it to the Foundation, it would be a sub-sublease.

14

Second, Exhibit B described a Parcel 1 sub-sublease that the parties intended to enter into. They later agreed, however, not to enter into that sub-sublease when they executed the Lease Assignment on October 1, 2002. That contract recited:

> D. Pursuant to that certain Memorandum of Understanding Reconciliation Agreement by and between Developer [Civic Idaho], Civic Partners West, LLC, an Idaho limited liability company, Civic Partners, Inc., a California corporation and the Foundation, dated July 31, 2002, (the "Reconciliation Agreement"), Developer agreed to sub-sublease Parcel 1 to the Foundation, and Foundation agreed to sub-sublease Parcel 1 from Developer.
>
> E. The Parties have determined that it to be in their mutual best interest of both parties to assign, and the Foundation to assume, all of Developer's rights and obligations under the Parcel 1 Sublease in lieu of the Developer sub-leasing Parcel 1 to the Foundation.

In the Lease Assignment, the parties agreed, with the consent and approval of Ada County and the CCDC, that the Foundation be substituted for Civic Idaho as lessee under the Parcel 1 Sublease. It provided that Civic Idaho "grants, conveys, assigns and transfers to the Foundation all of [Civic Idaho's] right, title and interest as the lessee pursuant to the Parcel 1 Sublease" and that the Foundation "accepts, assumes and agrees to perform the obligations of [Civic Idaho] under the Parcel 1 Sublease." Ada County and the CCDC also signed the Lease Assignment, thereby consenting to the assignment of the Parcel 1 Sublease to the Foundation and releasing Civic Idaho from all obligations under that Sublease. The Lease Assignment also provided, "Except as expressly set forth herein, all terms and conditions of the Reconciliation Agreement shall remain in full force and effect."

Thus, the Lease Assignment modified the Reconciliation Agreement by deleting the requirement that the parties enter into the Parcel 1 sub-sublease. Since Exhibit B dealt only with the provisions of that contemplated sub-sublease, it too is no longer a part of the Reconciliation Agreement. The provisions of Exhibit B cannot be the basis for asserting that the number of parking spaces available to the Foundation was a material term of the Reconciliation Agreement.

**3. Was there a condition precedent that did not occur?** The last sentence in Section 2.5 of the Reconciliation Agreement provides, "If . . . the Foundation transfers Unit 101 to the ISBA prior to September 1, 2003, . . . the Foundation shall commit to the Civic Entities to pay the Annual Contribution." The Foundation argues, "The only way the Foundation could 'transfer' its leasehold interest to the ISBA would be to assign its sublease or enter into a sub-

15

sublease with the ISBA. . . . The Foundation could not transfer its leasehold interest to the ISBA because the ISBA would not agree to build the IWC on leased land." Because the Foundation did not do either, it argues that the condition precedent did not occur.

"A condition precedent is an event not certain to occur, but which must occur, before performance under a contract becomes due. . . . When there is a failure of a condition precedent through no fault of the parties, no liability or duty to perform arises under the contract." *Dengler v. Hazel Blessinger Family Trust*, 141 Idaho 123, 128, 106 P.3d 449, 454 (2005).

The word "transfer" means "to make over or negotiate the possession or control of (a right, title, or property) by a legal process usu. for a consideration." *Webster's Third New International Dictionary of the English Language Unabridged* 2427 (Philip Babcock Gove et al. eds., G. & C. Merriam Co. 1971). *Black's Law Dictionary* 1503 (Bryan A. Garner ed., 7th ed., West 1999), states that a transfer "embraces every method—direct or indirect, absolute or conditional, voluntary or involuntary—of disposing of or parting with property or with an interest in property."

The provisions of the Reconciliation Agreement show that the word "transfer" was not limited to a lease assignment or a sub-sublease. The recitals in the Agreement stated, "The Parties desire to complete the sublease [actually sub-sublease] of Parcel 1 to the Foundation in a manner that will provide for the future acquisition of Unit 101 of the Civic Plaza Condominiums by the Idaho State Building Authority ("ISBA") for development of the Idaho Water Center." Section 2.1 of the Agreement provided that the Parcel 1 sub-sublease "shall provide for the acquisition by the ISBA of Unit 101." Section 1.3.2 provided, "The Civic Entities agree to use all commercially reasonable efforts to assist the Foundation in its negotiations with Ada County for the direct leasing by CCDC of Parcel 1, and for the ISBA's purchase of Unit 101 of the Civic Plaza Condominiums in accordance with the agreement reached between the Foundation and the ISBA."

The scenario set forth in Section 1.3.2 is what occurred. Civic Idaho and the CCDC entered into a sublease of Parcel 1. The Foundation and Civic Idaho entered into the "Lease Assignment and Assumption Agreement" which, with the consent of Ada County and the CCDC and their release of Civic Idaho, constituted a substitution of the Foundation for Civic Idaho as lessee under the Parcel 1 Sublease and the direct leasing of Parcel 1 to the Foundation by the CCDC. Then the Foundation, the CCDC, and Ada County entered into a "Transfer and Release

16

Agreement," which provided for the ISBA's purchase of Unit 101. Section 2.3 of the Transfer and Release Agreement provided that "the Agency [CCDC] and the Foundation hereby request, and consent to, the conveyance of Unit 101 directly from the County to the Authority [ISBA] pursuant to the Acquisition Agreement." Section 2.4 provided, "Concurrently with conveyance of fee title to Unit 101 to the Authority [ISBA] pursuant to the Acquisition Agreement, the County, Agency [CCDC] and Foundation acknowledge and agree that Unit 101 will be released from and in no respect subject to the Surplus Ground Lease and the Sublease." The Foundation represented and warranted, "All notices required as a condition to conveying Unit 101 have been timely delivered by the Foundation and are sufficient to authorize the conveyance of Unit 101 pursuant to this Agreement and the Acquisition Agreement." Contemporaneously with the "Transfer and Release Agreement," Ada County agreed in writing to convey Unit 101 to the ISBA. The district court did not err in holding that the Foundation transferred Unit 101 to the ISBA prior to September 1, 2003.

**4. Is the Reconciliation Agreement ambiguous?** The Foundation contends "that the Reconciliation Agreement is reasonably susceptible of conflicting interpretations—one interpretation making the contribution unconditional, but another reasonable interpretation making the contribution contingent upon the completion of a Parcel 1 Sublease with provisions for parking rights." It asserts that when Section 2.5 of the Reconciliation Agreement is read in connection with Exhibit B to that Agreement, it could reasonably be interpreted to mean that the Foundation "'shall commit' to pay the Annual Parking Contribution only after negotiating the terms and conditions of that payment once the Foundation, Civic [Idaho] and CCDC had reached agreement on what 'parking and other public improvements to be constructed or financed by CCDC' would be needed to make the IWC [Water Center] Project 'commercially functional.'" Although the Foundation states this conclusion, it does not explain how it arrived at it. It does not point to any wording in either document that allegedly supports this interpretation.

Where the Lease Assignment modified the terms of the Reconciliation Agreement, both contracts are to be construed together. *Opportunity, L.L.C. v. Ossewarde*, 136 Idaho 602, 607, 38 P.3d 1258, 1263 (2002); *Columbia Trust Co. v. Eikelberger*, 42 Idaho 90, 99, 245 P. 78, 81 (1925). "Whether a contract is ambiguous is a question of law over which we exercise free review." *Howard v. Perry*, 141 Idaho 139, 142, 106 P.3d 465, 468 (2005). "A contractual

17

provision will be found ambiguous if it is reasonably subject to conflicting interpretations." *Lovey v. Regence BlueShield of Idaho*, 139 Idaho 37, 46, 72 P.3d 877, 886 (2003).

As mentioned above, the Lease Assignment modified the Reconciliation Agreement by deleting the requirement that the parties enter into a Parcel 1 sub-sublease. Exhibit B dealt only with the provisions of that sub-sublease. When the Reconciliation Agreement and the Lease Assignment are construed together, Exhibit B is no longer a part of the Reconciliation Agreement. It therefore cannot be the basis for finding an alleged ambiguity in the Reconciliation Agreement.

**5. Did the district court base its granting of summary judgment upon credibility determinations?** The Foundation claims that the district court improperly relied upon credibility determinations in making findings of fact when it granted Civic Idaho's motion for summary judgment. The district court did not make any factual findings. It recited the undisputed material facts in its memorandum decision. The Foundation does not claim on appeal that there was conflicting evidence regarding any of those facts.

The Foundation's argument is based upon two statements made by the district court during the argument on the Foundation's motion for reconsideration of the order granting summary judgment. The court stated that maybe the Foundation should not have involved itself in complicated real estate transactions such as this one and that, from the court's perspective, its actions seemed to have been "bumbling." The Foundation asserts that the court's comments constituted an improper comment on the credibility of the Foundation's witnesses.

The problem with this assertion, even assuming it is correct, is that the testimony of the Foundation's witnesses or any other witnesses was not relied upon by the court in deciding these motions. The motions were decided upon the provisions of the parties' written contracts.

The Foundation also argues that the district court committed reversible error by adopting Civic Idaho's proposed factual findings and conclusions of law. As mentioned above, the district court did not make findings of fact when granting the motion for summary judgment or denying the motion for reconsideration. It listed the undisputed material facts, and the Foundation has not challenged any of them. With respect to the allegation that the district court adopted Civic Idaho's conclusions of law, the fact that the court's conclusions of law may have closely

18

paralleled the arguments of Civic Idaho simply reflects that Civic Idaho had the winning arguments in this case. *Bolger v. Lance*, 137 Idaho 792, 797, 53 P.3d 1211, 1216 (2002).

**B. Did the District Court Err in Finding that the Civic Entities Were Prevailing Parties on the Motions for Partial Summary Judgment?**

The Civic Entities sought an award of costs and attorney fees as prevailing parties on their motion for partial summary judgment. The district court denied their request without prejudice as being premature because there were still other claims remaining to be resolved between the Civic Entities and the Foundation. In its order, the district court also wrote, "While Civic Partners' claim is premature, it is clear that on the issue presented in the Summary Judgment, Civic Partners is the prevailing party. Therefore, at the conclusion of the litigation this finding will be factored in to resolve final claims of costs and fees pursuant to I.R.C.P. 54(d)(1)(B)."

The Foundation contends that the district court erred in stating that the prevailing party would ultimately be determined pursuant to Rule 54(d)(1)(B). The Reconciliation Agreement contained an attorney fee provision stating that the prevailing party in an action to enforce or interpret the Agreement shall be entitled to an award of a reasonable attorney fee. It also provided, "The prevailing party will be that Party who is awarded judgment as a result of trial or arbitration, or who receives a payment of money or other concession or agreements from the other Party in settlement of claims asserted by that Party." The Foundation argues that where a contract providing for the award of attorney fees defines "prevailing party" under that contractual provision, Rule 54(d)(1)(B) does not apply. In making that argument, it relies upon *Farm Credit Bank v. Wissel*, 122 Idaho 565, 836 P.2d 511 (1992). The *Wissel* case does not so hold.

In *Wissel*, the plaintiffs brought an action to obtain possession of a farm from the lessee and damages. The plaintiffs filed their action prior to the expiration of the lease and sought a preliminary injunction giving them immediate possession of the farm. The district court denied the preliminary injunction. After the lease expired, the plaintiffs then moved for partial summary judgment on their claim for possession, which the court granted. The parties later stipulated to dismiss the plaintiffs' damage claim and the defendants' counterclaim. The plaintiffs then sought an award of costs and attorney fees. The district court held that neither party prevailed

19

under Rule 54(d)(1)(B), and the plaintiffs appealed, contending that the district court erred in holding that they were not the prevailing parties under Rule 54(d)(1)(B) and in failing to award costs and attorney fees under a provision in the lease. The lease provision stated, "In the event that the Lessor does find it necessary to bring suit or action under the terms of this lease, then the Lessee hereby agrees to pay the Lessor's reasonable attorney fees and costs of suit incurred in said suit or action."

On appeal, this Court held that the district court did not err in ruling that there was no prevailing party under Rule 54(d)(1)(B). We held, however, that the district court erred in failing to consider the attorney fee provision in the lease because nothing in that provision required that the lessor be a prevailing party in order to recover costs and attorney fees. This Court did not hold that the attorney fee provision of the lease rendered Rule 54(d)(1)(B) inapplicable. Had we so held, we would not have affirmed the district court's finding that there was no prevailing party under Rule 54(d)(1)(B).[6] Rather, we held that both Rule 54(d)(1)(B) and the lease provision applied. Therefore, the district court in this case did not err in making an interim finding that the Civic Entities were prevailing parties with respect to the litigation regarding the Foundation's third cause of action.

## C. Did the District Court Err in Ruling that the CCDC Was Entitled to an Award of Attorney Fees Under Idaho Code § 12-120(3)?

The district court awarded the CCDC attorney fees pursuant to Idaho Code § 12-120(3), which grants the prevailing party the right to an award of a reasonable attorney's fee in "any civil action to recover . . . in any commercial transaction." The statute applies to declaratory judgment actions if the gravamen of the action is a commercial transaction. *Freiburger v. J-U-B Engineers*, *Inc.*, 141 Idaho 415, 423, 111 P.3d 100, 108 (2005). "The term 'commercial

---

[6] In *Wissel*, this Court held:

> We affirm the trial court's determination that there was no "prevailing party" for purposes of awarding costs under I.R.C.P. 54(d)(1). However, we vacate the trial court's order and remand the case to the trial court to specifically address FCB's and the Ketterlings' claim to attorney fees and costs pursuant to the express provision in the farm lease, set out above, and to make findings of fact and conclusions of law with regard to any entitlement on the part of plaintiff-appellants to fees and costs under that contractual provision.

122 Idaho at 569, 836 P.2d at 515.

transaction' is defined to mean all transactions except transactions for personal and household purposes." I.C. § 12-120(3). Since the Foundation's allegations in the third cause of action in its amended complaint did not involve anything for a personal or household purpose, the statute is applicable if the claim was a transaction involving the CCDC. The district court held that the entire series of contracts among the various entities constituted a single commercial transaction in which the CCDC was an integral party. The Foundation contends that Section 12-120(3) does not apply because the only transaction alleged in its amended complaint was the Reconciliation Agreement, to which the CCDC was not a party.

"Idaho Code § 12-120(3) does not require that there be a contract between the parties before the statute is applied; the statute only requires that there be a commercial transaction." *Great Plains Equip., Inc. v. Northwest Pipeline Corp.*, 136 Idaho 466, 472, 36 P.3d 218, 224 (2001). In other contexts, this Court has given a broad meaning to the word "transaction."

In *McKay v. Owens*, 130 Idaho 148, 937 P.2d 1222 (1997), Owens, an attorney, represented McKay and her disabled son in a medical malpractice case, and Manweiler was appointed as the son's guardian ad litem to represent him in a proceeding to approve a settlement of the medical malpractice action. McKay agreed to the settlement in open court, and, after it was approved by the court, she filed a legal malpractice claim against Owens and Manweiler, contending that she had not approved of the settlement. This Court held that her legal malpractice claim was barred by the doctrine of judicial estoppel, but for that to apply the legal malpractice case and the medical malpractice case had to arise out of the same transaction. This Court held that they did, reasoning as follows: "While Owens and Manweiler were not parties to the medical malpractice action, as attorneys in the case, they were so intimately intertwined with the medical malpractice proceedings that this legal malpractice action can be termed to be 'arising out of the same transaction.'" 130 Idaho at 154, 937 P.2d at 1228.

In *Mittry v. Bonneville County*, 38 Idaho 306, 222 P. 292 (1923), the County had a building fund to construct a courthouse and jail, the money in the fund coming from the sale of voter-approved bonds and the auction of some County property. Out of that fund, the County paid for the land on which to build the courthouse, the architect fees, and the building's foundation. It then let three contracts for the construction of the courthouse, but the total amount of those contracts exceeded the money remaining in the building fund. The plaintiff had entered into two of the construction contracts, and another entity had entered into the third contract to

21

install the plumbing and heating systems. The money in the fund was paid out as work progressed and was exhausted before the plaintiff was paid in full. He brought an action against the County, and obtained a judgment for the balance he was owed. The district court held that the County was obligated to pay the plaintiff because at the time the plaintiff contracted with the County, there was sufficient money in the building fund to pay him. This Court reversed, reasoning that "the letting of the contracts was one transaction for one common purpose, to wit, the erection and completion of the courthouse." 38 Idaho at 313, 222 P. at 294. This Court then held that the plaintiff's right to the money in the fund was no greater than that of the plumbing and heating contractor, and once that money was gone, the plaintiff was not entitled to be paid the remainder owing him.

In *Woodward v. City of Grangeville*, 13 Idaho 652, 92 P. 840 (1907), the mayor of Grangeville entered into a contract on behalf of the city to purchase a water system for $32,000. A month later, the city council adopted an ordinance providing for the issuance of $30,000 in bonds, which was then approved by the voters. When the transaction was challenged, this Court held that the contract was void because the mayor lacked authority to enter into it and because the contract price exceeded the amount approved by the voters in the bond election, and there was no provision for paying the difference. The City argued that even if the contract was void, it should still be permitted to issue the bonds because the voters approved issuing the bonds to acquire, construct, and maintain waterworks for the City, not to purchase these specific waterworks. This Court disagreed because it had been "the declared intention" of the city council to invest the bond proceeds in acquiring the waterworks being sold under the void contract. 12 Idaho at 661, 92 P. at 842. This Court concluded, "We cannot escape the conclusion, therefore, that the contract and the proposed bonds were part of one and the same transaction, and that if the contract was void, and the bonds were voted for the purpose of complying with the terms of said contract, that the bonds necessarily must fall with the contract." *Id.*

Thus, in *McKay v. Owens* this Court held that where the attorneys sued in a legal malpractice case had represented parties in the prior medical malpractice case, they were so "intimately intertwined" with the medical malpractice proceedings that the legal malpractice case could be considered as having arisen out of the same transaction as the medical malpractice case. In *Mittry v. Bonneville County* this Court held that all of the contracts let by the county for

22

construction of a courthouse were, from the County's perspective, one transaction because they had "one common purpose," which was the erection and completion of a courthouse. In *Woodward v. City of Grangeville* this Court held that a void contract and the issuance of voter-approved bonds were the same transaction because it had been the City's "declared intention" to use the bond proceeds to fulfill its obligations under the contract. *Black's Law Dictionary*, 1668 (rev. 4th ed. 1968), states that a "transaction" "must therefore consist of an act or agreement, or several acts or agreements, having some connection with each other, in which more than one person is concerned, and by which the legal relations of such persons between themselves are altered."

The Foundation desired to have the Idaho Water Center constructed on Unit 101 of Parcel 1 of the Courthouse Corridor Project for use by the University of Idaho, and it wanted the ISBA to finance that construction. The ISBA would not do so unless it owned the land and was the developer. The ISBA would not have to pay taxes on the land if it owned it, I.C. § 67-6412, and it was unwilling to make payments in lieu of taxes.

At the time that the Foundation became involved, Ada County had leased the four-acre Avenue A site, which included Parcel 1, to the CCDC for ninety-nine years under the Surplus Ground Lease, and the CCDC had entered into the Avenue A Disposition and Development Agreement with Civic Idaho. The Avenue A Disposition and Development Agreement gave Civic Idaho the right to develop the property and the right to possession of the property.

The CCDC intended to construct an underground parking facility to serve Parcel 1, but it needed tax increment revenue from Parcel 1 and parking revenue to service the bonds it would issue to pay for that construction. To ensure that revenue stream, it demanded payments in lieu of taxes from Civic Idaho if land in Parcel 1 was owned or occupied by a tax-exempt entity. The CCDC intended to sublease Parcel 1 to Civic Idaho under the Avenue A Sublease, and Civic Idaho intended to sub-sublease the land to whoever would ultimately occupy it. Civic Idaho obviously did not want to be making the payments in lieu of taxes and wanted to pass that obligation on to its sub-sublessee. If Unit 101 were transferred to the ISBA, there would be no sub-sublessee, nor would the ISBA be paying taxes on the property.

To accomplish its goal of having the Water Center constructed on Unit 101, the Foundation knew that there would have to be several contracts among or between the various entities involved—Ada County, the CCDC, the Civic Entities, the Foundation, the University,

and the ISBA. The first of those contracts was the Reconciliation Agreement between the Foundation and the Civic Entities. That contract stated the Foundation's goal, "The Parties desire to complete the sublease [actually sub-sublease] of Parcel 1 to the Foundation in a manner that will provide for the future acquisition of Unit 101 of the Civic Plaza Condominiums by the Idaho State Building Authority ("ISBA") for development as the Idaho Water Center." To achieve that purpose, the Reconciliation Agreement required adding provisions in existing or contemplated contracts involving other parties. Section 2.1 required, "The Surplus Ground Lease between Ada County and CCDC, dated May 1, 2000 . . . [the] Avenue A Sublease between CCDC and Civic Idaho, which is anticipated to be executed . . . and [the] Parcel 1 Sublease shall provide for the acquisition by the ISBA of Unit 101." It also included the requirement in Section 2.5, "If . . . the Foundation transfers Unit 101 to ISBA . . . Unit 101 shall not be subject to any binding covenant to pay the Annual Contribution, but the Foundation shall commit to the Civic Entities to pay the Annual Contribution."

A little over a month later, various parties involved executed a second series of contracts, all of which were made effective on October 1, 2002. It obviously was no coincidence that these contracts were all made effective on the same date. The parties to the contracts were working together to accomplish the Foundation's goal of having Unit 101 transferred to the ISBA. The CCDC and Civic Idaho amended their Avenue A Disposition and Development Agreement. The amendments included a provision stating that the CCDC agreed "to enter into a Parking Allocation Agreement with the owner or master tenant of Unit 101, as may be required pursuant to that Memorandum of Understanding Reconciliation Agreement, dated July 31, 2002." The CCDC and Civic Idaho also entered into a Parcel 1 Sublease rather than the previously proposed Avenue A Sublease, which provided, "Upon the assignment of this Parcel 1 Sublease to the Foundation, Developer [Civic Idaho] shall be released from all obligations under this Parcel 1 Sublease." The Foundation and Civic Idaho entered into a "Lease Assignment and Assumption Agreement" under which Civic Idaho assigned to the Foundation all of its right, title, and interest as the lessee under the Parcel 1 Sublease, and the Foundation assumed and agreed to perform all of the obligations of Civic Idaho under that Sublease. Ada County and the CCDC also signed the Lease Assignment, thereby releasing Civic Idaho from all obligations under the Parcel 1 Sublease. Finally, the Foundation, Civic Idaho, and the CCDC entered into an "Agreement in Connection with the Assignment and Assumption of the Parcel 1 Sublease." By this Agreement,

24

the parties agreed to "negotiate diligently and in good faith to amend and/or supplement the Parcel 1 Sublease to reflect the respective rights and obligations of the Foundation as set forth in the Reconciliation Agreement."

The Foundation's goal was finally achieved by three contracts entered into on December 17, 2002. The Foundation, the CCDC, and Ada County entered into a "Transfer and Release Agreement" under which the County agreed to convey fee simple title of Unit 101 to the ISBA. The parties to that Agreement also agreed that upon that transfer, Unit 101 would be released from the Surplus Ground Lease between Ada County and the CCDC and the Parcel 1 Sublease between the CCDC and the Foundation. The University of Idaho and the CCDC entered into a Parking Access Agreement under which the University of Idaho agreed to pay the Annual Contribution to the extent funds were available. Finally, Ada County and the ISBA entered into a "Unit 101 Acquisition Agreement" under which the County agreed to sell Unit 101 to the ISBA for $2,000,000. The closing of this final agreement triggered the Foundation's requirement in the Reconciliation Agreement to pay the Annual Contribution that is the subject of this lawsuit.

Although there were eight contracts involving six separate entities, all of the above-mentioned contracts constituted one transaction. They were all executed to achieve the Foundation's purpose of transferring Unit 101 to the ISBA so that it would construct on Unit 101 the Water Center to be used by the University of Idaho. That transaction was also a commercial transaction because it was not for personal or household purposes. I.C. § 12-120(3).

Finally, this commercial transaction was the gravamen of the Foundation's lawsuit. By the third cause of action in its amended complaint, the Foundation sought a determination that neither it nor the Civic Entities were obligated to make the payments in lieu of taxes, which the Annual Contribution was. The district court did not err in concluding that the CCDC was entitled to an award of attorney fees under Idaho Code § 12-120(3).

## D. Did the District Court Abuse Its Discretion in Determining the Amount of Attorney Fees to Award?

The district court initially awarded the CCDC attorney fees in the sum of $184,554.45. It later awarded the CCDC an additional sum of $29,046.50 in attorney fees incurred in defending against the Foundation's motion to disallow the requested award of attorney fees. The Foundation challenges on appeal the amount of attorney fees awarded by the district court.

"The calculation of reasonable attorney fees is within the discretion of the trial court." "The burden is on the party opposing the award to demonstrate that the district court abused its discretion." To determine whether the trial court abused its discretion, we determine: (1) whether the trial court correctly perceived the issue as one of discretion; (2) whether the trial court acted within the outer boundaries of its discretion and consistently with the legal standards applicable to the specific choices available to it; and (3) whether the trial court reached its decision by an exercise of reason.

*Lettunich v. Lettunich*, 145 Idaho 746, ___, 185 P.3d 258, 261 (2008) (citations omitted).

The CCDC initially requested an award of $184,554.45 in attorney fees pursuant to Idaho Code § 12-120(3). The Foundation filed a motion to disallow the requested fees, contending that Section 12-120(3) was inapplicable and that the amount requested was excessive. After the district court ruled in favor of the CCDC and awarded it the fees claimed, it requested a supplemental award of $29,046.50 for fees incurred in litigating the attorney fee issue. The Foundation filed a motion to disallow the supplemental fees requested, waiving oral argument on the motion. The district court granted the supplemental fee request, so that the total amount it awarded to the CCDC in attorney fees was $213,600.95

The Foundation first argues, "The district court granted both of CCDC's requests without analyzing them under Rule 54(e)(3)." Although the court must consider the factors listed in Rule 54(e)(3) of the Idaho Rules of Civil Procedure when determining the amount to award in attorney fees, the court need not demonstrate how it employed any of the factors in reaching an award amount. *Parsons v. Mutual of Enumclaw Inc. Co.*, 143 Idaho 743, 747, 152 P.3d 614, 618 (2007). The court need not specifically address each of the factors, as long as the record indicates that it considered them all. *Id.* In its order awarding fees, the district court stated, "After a careful review of the Perkins Coie invoices submitted, the affidavits submitted on behalf of CCDC and the Foundation, and the arguments of the parties, *and consideration of the factors set forth in I.R.C.P. 54(e)(3)*, the Court finds that the attorneys' fees incurred and claimed by CCDC are reasonable." (Emphasis added.) The record indicates that the district court considered the factors listed in Rule 54(e)(3).

The Foundation makes conclusory allegations that the attorney fees awarded by the district court are excessive. It alleges, "The billing records showed duplicative effort by

attorneys and significant time spent doing nothing more than review documents and confer with counsel for Civic." The district court found:

> While the evidence shows that Mr. Bond provided the bulk of the time on this case, the evidence also shows that Mr. Boardman's continual involvement was reasonable for supervision, client interaction, and possible trial. While Mr. Boardman and Mr. Bond did, from time to time, review some of the same documents, Mr. Bond's practice of filtering which documents and communications required Mr. Boardman's attention significantly limited potentially duplicative review and kept the attorney's fees reasonable. The Court finds the claimed attorneys' fees reasonable under the circumstances.

Next, the Foundation alleges, "The district court also abused its discretion in awarding CCDC's supplemental fees for researching and writing the attorney fees motions." The Foundation states that the total amount awarded was excessive, but does not point to any specific charges in the time records presented by the CCDC's counsel that it contends were excessive. The Foundation does not point to anything in the record indicating what it contends a reasonable fee would be.

Finally, the Foundation challenges the amount awarded for paralegal and legal assistant fees on the ground that the work done was secretarial in nature. The CCDC's counsel stated that the work would have been done by an attorney if it had not been done by the paralegals and legal assistants. The district court resolved that dispute by finding as follows:

> The Court holds that regardless of whether the assistants are titled paralegals, legal assistants or some other title, if the assistants performed tasks that an attorney otherwise would have performed in the absence of the assistants, reasonable fees may be recovered. In this case, the Court finds that all of the fees claimed for legal assistants' and paralegals' services represented services which, but for the assistants and paralegals, an attorney would have performed. Additionally, after reviewing the billing records, affidavits and arguments of the parties, the Court finds that the fees charged for the services performed by the paralegals and legal assistants were reasonable.

In awarding the fees, the district court correctly perceived the issue as one of discretion. The Foundation has not shown that the district court acted beyond the outer boundaries of its discretion or that it did not act consistently with the applicable legal standards. The Foundation has also not shown that the district court failed to reach its decision by the exercise of reason. We therefore affirm the award.

27

**E. Did the District Court Abuse Its Discretion in Its Award of Court Costs to the CCDC?**

The district court awarded the CCDC court costs in the sum of $13,536.52 under Idaho Code § 10-1210 and alternatively under Rule 54(d)(1)(D) of the Idaho Rules of Civil Procedure. Idaho Code § 10-1210 provides that in a declaratory judgment action, the "the court may make such award of costs as may seem equitable and just." Rule 54(d)(1)(D) permits the award of discretionary costs "upon a showing that said costs were necessary and exceptional costs reasonably incurred, and should in the interest of justice be assessed against the adverse party." The Foundation only challenges the $9,707.02 in discretionary costs included in the award on the ground that the district court did not make the required findings when awarding the costs. It contends, "The district court made no findings that CCDC's discretionary costs were 'necessary and exceptional' or that an award of these costs was 'equitable and just.'"

When awarding costs, the district court found that the Foundation chose to pursue "novel arguments and approaches to try to advance the Foundation's interests and relieve it of its obligations. . . . *Equity and justice* shows that, as between the Foundation and CCDC, the Foundation should bear these costs." (Emphasis added.) Contrary to the Foundation's assertions, the district court did find that it would be equitable and just for the CCDC to be awarded costs against the Foundation. We affirm the award of discretionary costs under Idaho Code § 10-1210, and therefore do not need to address whether the district court made the findings required to award costs under Rule 54(d)(1)(D).

**F. Is Any Party Entitled to an Award of Attorney Fees on Appeal?**

The Foundation seeks an award of attorney fees on appeal pursuant to Idaho Code §§ 12-120(3) and 12-121. Civic Idaho seeks an award of attorney fees on appeal pursuant to the Reconciliation Agreement and Idaho Code §§ 12-120(3) and 12-121. The CCDC seeks an award pursuant to Section 12-120(3).

Civic Idaho is the prevailing party with respect to the Foundation's claim against it that was the subject of this appeal. However, there are other claims that remain to be litigated between these two parties. Although Civic Idaho prevailed on this appeal, it remains to be determined whether it or the Foundation will ultimately be the prevailing party in this litigation. Therefore, we do not award Civic Idaho attorney fees on appeal. If the district court ultimately finds that one of these two parties is the prevailing party in the litigation, that party will be

28

entitled to an award of attorney fees under Idaho Code § 12-120(3). When fixing the amount of that award, the court may consider the attorney fees incurred in bringing or defending this appeal. *Gillingham Constr., Inc. v. Newby-Wiggins Constr., Inc.*, 136 Idaho 887, 894, 42 P.3d 680, 687 (2002).

The CCDC is the prevailing party with respect to the Foundation's claim against it, and there are no remaining claims between them. We therefore award the CCDC attorney fees on appeal against the Foundation pursuant to Idaho Code § 12-120(3).

## IV. CONCLUSION

The partial judgment of the district court on the third count of the Foundation's complaint is affirmed. We award costs on appeal to both Civic Idaho and the CCDC, and we award attorney fees on appeal to the CCDC.

Justices BURDICK, HORTON and Justice Pro Tem KIDWELL **CONCUR.**

J. JONES, J., specially concurring.

I fully concur in the Court's opinion but feel it necessary to comment upon a ruling by the district court that was not pursued by the Foundation on appeal. The district court did a good job of winnowing through the various agreements and the conflicting arguments made by the parties with respect thereto, but too lightly dismissed one of the Foundation's legal theories – that the parties had agreed to a novation whereby the University of Idaho would be substituted in place of the Foundation to assume and pay the Annual Contribution of $350,000.

The Foundation argued to the district court that by virtue of the University's entry into a Parking Access Agreement with CCDC on December 17, 2002, whereby the University agreed to pay the $350,000 Annual Contribution for a period of 30 years, the Foundation and Civic Partners had accomplished a novation of the contract, relieving the Foundation of its obligation to pay the Annual Contribution and substituting the University of Idaho as the sole party responsible for paying the same. The district court ruled against the Foundation on its novation argument, stating: "The Annual Contribution agreed to by the University under the Parking Access Agreement is a parking access fee, is renewable by the University each year, and is subject to termination by the University in the event funds are not available." It appeared to be

29

the district court's belief that the performance undertaken by the University was not essentially the same as that required of the Foundation and, therefore, a novation could not have been agreed upon between the Foundation and Civic Partners. When asked why the Foundation did not appeal this ruling, counsel essentially responded that the district court's ruling was not incorrect.

It should first be observed that in a novation the parties can agree to different terms in the new agreement than those which were contained in the previous agreement. Novation is a species of accord and satisfaction and, "[a] novation results when an accord and satisfaction is reached by substitution of a new agreement or performance in place of the performance or compromise of the original obligation." *Harris v. Wildcat Corp.*, 97 Idaho 884, 886, 556 P.2d 67, 69 (1976). In order to establish an accord and satisfaction, the parties accepting a new or different obligation must do so knowingly and intentionally, but "[a]n accord and satisfaction may be implied from the attendant circumstances." *Id.* Thus, the performance in the new contract need not be identical to that in the old contract. What is necessary is the mutual agreement of the parties to the old contract to any changes in the performance, as well as the identity of the party obligated to provide that performance.

It appeared to be the assumption of all concerned in the proceedings in district court that the novation under review primarily dealt with substituting the University in place of the Foundation as the party obligated to make the Annual Contribution. Assuming there was no contention that the performance to be rendered was different in nature, the district court was wrong in determining out of hand that the performance of the University was not comparable to the performance required of the Foundation. The district court viewed the University's obligation to be different because the Annual Contribution was characterized as a "parking access fee" in the Parking Access Agreement. However, the Parking Access Agreement also specifically identified the $350,000 per year obligation as an "Annual Contribution" and the provisions of section 2.2 of that agreement, as concerns the specifics of the payment, the length of the obligation (30 years) and the credit to be applied for parking used by the "Forest Service (or other tax-paying owners or tenants)" are virtually identical to the provisions of section 2.5 of the Reconciliation Agreement.

The other two distinctions made by the district court are what prompted this special concurrence. The district court apparently held the view that the performance under the allegedly novated contract was automatically disqualified as being comparable to the

performance under the Foundation's contract because the Parking Access Agreement provided the University's parking lease was renewable each year and was subject to termination by the University in the event funds were not available. The fact of the matter is that all state contracts contain those same provisions because Article VIII § 1 of the Idaho Constitution prohibits the State from incurring multi-year indebtedness without submitting the matter to the public for a vote. Article VIII § 3 imposes a similar limitation on public indebtedness with respect to subdivisions of state government. It is a virtual impossibility to present every multi-year governmental contract or lease to the public for a vote. Thus, leases and other contracts that are intended to extend beyond one year always contain provisions (1) making the government's performance subject to availability of appropriated funds and (2) making the agreement renewable on an annual basis for the contemplated term. That does not necessarily mean that the government's contracts or leases are less worthy than those between private parties. Governmental entities, while having the ability to do so, rarely invoke these clauses to terminate a contract prematurely. Further, private parties can negotiate terms that will essentially provide assurance of performance by the governmental entity for the contemplated duration of the contract or lease. That appears to be what occurred here. The Parking Access Agreement tied payment of the $350,000 Annual Contribution to the availability of parking to the University. In other words, should the University determine that there were not appropriated funds to pay the Annual Contribution or otherwise decide not to renew the contract for a succeeding year, it would lose its parking rights for the building. This certainly is a powerful disincentive to terminate the agreement prematurely.

In viewing the record in this case, there appears to be conflicting evidence as to whether or not the Foundation and Civic Partners agreed to a novation that would substitute the University in place of the Foundation as the party solely obligated for the Annual Contribution. It does not appear that summary judgment would have been appropriate simply because the Parking Access Agreement contained the two provisions made necessary in order to avoid invalidity by virtue of Article VIII § 1. It is unfortunate that the novation issue was not presented to this Court for determination because it is an issue of substantial importance for state entities and the strength of their contracts.