42 P.3d 680

**GILLINGHAM CONSTRUCTION, INC., an Idaho corporation, Plaintiff–Counter–defendant–Appellant,**

v.

**NEWBY–WIGGINS CONSTRUCTION, INC., an Idaho corporation, Defendant–Counterclaimant–Respondent.**

**Newby–Wiggins Construction, Inc., an Idaho corporation, Third–Party Plaintiff,**

v.

**State of Idaho, Third–Party Defendant.**

**State of Idaho, Third–Party Plaintiff,**

v.

**Lombard–Conrad Architects, P.A., an Idaho professional corporation, Third–Party Defendant.**

**No. 26577.**

Supreme Court of Idaho, Boise, December, 2001 Term.

Feb. 22, 2002.

Barker, Rosholt & Simpson LLP, Boise, for appellant. Albert P. Barker argued.

Perkins Coie, LLP, Boise, for respondent. Richard C. Boardman argued.

EISMANN, Justice.

This is an appeal from a directed verdict dismissing the plaintiff's claim for breach of a construction contract. We affirm in part, reverse in part, and remand for further proceedings.

## I. FACTS AND PROCEDURAL HISTORY

Viewing the evidence favorably to the appellant Gillingham Construction, Inc., (Gillingham), as we must on an appeal from a directed verdict, the facts are as follows. The State of Idaho awarded the respondent Newby–Wiggins Construction, Inc., (Newby–Wiggins) the prime contract to construct the regional headquarters building for the Idaho Department of Parks and Recreation on Warm Springs Avenue in Boise, Idaho. On July 19, 1993, Newby–Wiggins entered into a subcontract with the appellant Gillingham under which Gillingham agreed to perform certain demolition and excavation work in connection with that construction project. That work included demolishing and removing the remains of an old brickyard; excavating the building pads and parking areas for the new construction; and rough grading the site. Newby–Wiggins agreed to pay Gillingham a lump sum for its work under the subcontract.

Gillingham first completed the demolition and removal of the buildings, concrete and asphalt driveways, and other remnants of the old brickyard, and it then began preparing the ground for construction as required in its subcontract. It completed the ground preparation in stages, first installing the pad for the construction of the headquarters building, then excavating and grading for the west parking lot, and then excavating and grading for the east parking lot. Before Gillingham began work on each stage, another subcontractor would drive survey stakes into the ground in that portion of the construction site. The survey stakes would show the existing elevation of the ground and the depth of dirt, in hundredths of an inch, that Gillingham would have to either cut (remove) or fill (add) in order to bring the existing ground elevation to the finish grade elevation specified in the plans. After Gillingham had completed approximately 85% of the work required under its subcontract, its project superintendent discovered that there was an error in the elevations recorded on the survey stakes. While grading a portion of the site where the elevation of the finish grade was to match the elevation of the adjoining land, he realized that the two grades would not match.

Gillingham's project superintendent brought the problem to the attention of Newby–Wiggins, and the matter was then discussed at the next weekly construction meeting, which was held on October 6, 1993. After the meeting, representatives of Gillingham, Newby–Wiggins, and the State checked the problem area. They discovered that in parts of the construction site that were still undisturbed, the elevations shown on the plans did not correspond to the elevations shown on the survey stakes. Newby–Wiggins and the architect hired by the State then told Gillingham to stop work on the project until the problem could be resolved.

After Gillingham had stopped work for sixteen days, it removed its equipment from the site (demobilized) until it received word from Newby–Wiggins to resume work. On November 1, 1993, Gillingham moved its

equipment back to the site (remobilized), but seven days later it was again told to stop work. At some point in November, Gillingham returned to work, but had to stop working again because of the weather. It completed its obligations under the subcontract in the spring of 1994, based upon new site drawings that were prepared for the project.

Gillingham requested additional compensation for its work done on the site. It contended that the survey upon which the site drawings were based was incorrect and that the elevations shown on those drawings were lower than the actual elevations. As a result, Gillingham was required to remove more dirt than the site drawings showed it would be required to move. It also claimed compensation for the time that its equipment sat idle at the construction site after it was told to stop work (standby charges) and for the costs incurred in demobilizing and remobilizing.

On June 27, 1997, Gillingham filed this action against Newby–Wiggins seeking to recover the additional compensation it claimed. Newby–Wiggins filed a third-party claim against the State, alleging that Gillingham's damages were caused by the State. The State then filed a third-party claim against the architects it had hired to draw the plans and specifications for the project, alleging that the architects were liable for any deficiency in those plans and specifications.

After being set and rescheduled several times, this case was set for a jury trial to commence on April 3, 2000. Just prior to trial, Gillingham entered into a settlement with the State. Although the settlement documents are not part of the record, in its brief Gillingham describes the terms of the settlement as follows, "Gillingham settled Newby–Wiggins' indemnity claim against the State and agreed to indemnify the State for any liability it might have as a result of Newby–Wiggins' indemnification claim."

After three days of trial, Gillingham rested its case against Newby–Wiggins, who then moved for a directed verdict dismissing Gillingham's complaint. The district court granted that motion, and later awarded Newby–Wiggins court costs, including attorney fees, totaling $60,642.19. Gillingham then appealed.

## II. ANALYSIS

Gillingham alleged three causes of action in its complaint. In Count One it alleged that Newby–Wiggins had impliedly warranted the sufficiency of the plans and specifications provided by the State and had breached that warranty. In Count Two it alleged that it was entitled to additional compensation for the extra work it was required to perform because of the defective plans and specifications provided by the State. In Count Three it alleged that Newby–Wiggins was unjustly enriched by the extra work that Gillingham had performed on the project. Prior to trial, the district court granted Newby–Wiggins' motion to dismiss Count Three for failure to state a claim upon which relief could be granted, and Gillingham has not appealed that dismissal. This case went to trial on Gillingham's claims of breach of an implied warranty regarding the sufficiency of the plans and specifications and for additional compensation for the extra work.

A. **Did the district court err in dismissing Gillingham's claim that Newby–Wiggins had impliedly warranted that the plans and specifications provided by the State were sufficient?**

■ The district court dismissed the implied warranty claim at the conclusion of Gillingham's case on the ground that under Idaho law a general contractor does not impliedly warrant to a subcontractor the sufficiency of the plans and specifications provided by the owner. Whether or not such a warranty is implied in construction contracts between contractors and their subcontractors is an issue of law over which we exercise free review.

Although not yet addressed by appellate courts in Idaho, courts in several other jurisdictions have held that an owner who provides plans and specifications to a contractor impliedly warrants that they are sufficient for their particular purpose. *State, Dept. of Natural Res. v. Transamerica Premier Ins. Co.,* 856 P.2d 766 (Alaska 1993); *Souza & McCue Constr. Co., Inc. v. Superior Court,*

57 Cal.2d 508, 20 Cal.Rptr. 634, 370 P.2d 338 (1962); *Lutey Constr.-The Craftsman v. State*, 257 Mont. 387, 851 P.2d 1037 (1993); *A.H. Barbour & Son, Inc. v. State Highway Comm'n*, 248 Or. 247, 433 P.2d 817 (1967). That implied warranty is part of the contract between the owner and the contractor, and if defective plans or specifications cause the contractor to incur extra costs in performing the contract, then the contractor may recover the costs that result from the breach of the implied warranty.

Gillingham has not presented any authority holding that a similar warranty is implied in the contract between a contractor and subcontractor. It argues that because of the lack of privity, it cannot recover directly against the State for breach of an implied warranty regarding the sufficiency of the plans and specifications. See *Ramerth v. Hart*, 133 Idaho 194, 983 P.2d 848 (1999). Therefore, creating such an implied warranty in its contract with Newby–Wiggins would enable Gillingham to recover its additional costs from Newby–Wiggins, and then Newby–Wiggins could seek indemnity from the State.

Gillingham has not convinced us that we should create in the contract between it and Newby–Wiggins an implied warranty that the plans and specifications provided by the State were sufficient.[1] Newby–Wiggins is not the owner for whom the construction is being done, nor did it select the architect who prepared those plans and specifications. Indeed, in this case there is not even any evidence that Gillingham obtained the plans and specifications from Newby–Wiggins. Gillingham's president testified that he did not know where Gillingham obtained the plans and specifications, but it would have been either from the architect hired by the State or from Newby–Wiggins.

Gillingham also argues that the subcontract between it and Newby–Wiggins incorporated into its terms the implied warranty as to the sufficiency of the plans that was part of the prime contract between Newby–Wiggins and the State. In making this argu-

ment, it relies upon that portion of the subcontract which provides, "Subcontractor shall review the Prime Contract, and Subcontractor agrees in respect to the Work to be bound to Contractor by all the obligations set forth in the Prime Contract that the Contractor assumed." In other words, Gillingham assumed, with respect to the work included in the subcontract, all of the obligations that Newby–Wiggins had assumed with respect to that work under the prime contract.

An implied warranty as to the sufficiency of the plans was not an obligation assumed by Newby–Wiggins under the prime contract. Any such implied warranty would be an obligation owed by the State to Newby–Wiggins, and Newby–Wiggins did not assume the obligations of the State. Thus, if we were to hold that an owner impliedly warrants to the general contractor the sufficiency of the plans and specifications provided by the owner, that implied warranty would not be an obligation that Newby–Wiggins assumed in its contract with the State, and it therefore could not be an obligation of Newby–Wiggins that Gillingham assumed in its subcontract. We hold that the district court did not err in dismissing Gillingham's claim against Newby–Wiggins based upon the alleged implied warranty as to the sufficiency of the plans and specifications.

**B. Did the district court err in granting a directed verdict dismissing Gillingham's claim seeking payment for extra work?**

When reviewing on appeal a trial court's grant of a directed verdict, we conduct an independent review of the evidence and do not defer to the findings of the trial court. *Sheridan v. St. Luke's Reg'l Med. Cntr.*, 135 Idaho 775, 25 P.3d 88 (2001). We must determine whether, admitting the truth of the adverse evidence and drawing every legitimate inference most favorably to the opposing party, there exists substantial evidence to justify submitting the case to the jury. *Id.* The "substantial evidence" test does not require that the evidence be uncon-

---

1. We do not address the issue of whether a subcontractor can recover directly from the owner or architect when the subcontractor incurs additional costs due to an error in the plans and specifications.

tradicted, or even that we find it persuasive. We do not weigh the evidence or consider the credibility of the witnesses. *Polk v. Larrabee*, 135 Idaho 303, 17 P.3d 247 (2000). It requires only that the evidence be of sufficient quantity and probative value that reasonable minds could conclude that a verdict in favor of the party against whom the motion is made is proper. *Sheridan v. St. Luke's Reg'l Med. Cntr.*, 135 Idaho 775, 25 P.3d 88 (2001). A directed verdict is proper only where the evidence is so clear that all reasonable minds would reach only one conclusion—that the moving party should prevail. *Id.*

■ In its claim seeking payment for extra work, Gillingham relies upon this Court's decision in *Beco Corporation v. Roberts & Sons Construction Company, Inc.*, 114 Idaho 704, 760 P.2d 1120 (1988), wherein we stated:

Case law has established a rule that

under appropriate circumstances, the contractor who encounters substantially different conditions in performing a construction contract from those contemplated and set forth in the plans and specifications contained therein may be entitled to increased compensation for the additional work. See generally 76 A.L.R. 268; 85 A.L.R.2d 212. The test of whether or not such contractor is entitled to additional compensation is whether or not he justifiably relied upon the plans and specifications for the construction in making his bid and entering into the contract. (citations omitted). The reason for this rule is that if unanticipated conditions not reasonably foreseeable are actually encountered in the work and vary substantially from anticipated conditions reasonably foreseeable by the parties at the time they entered into the contract, the contractor is performing an entirely different contract than the one agreed upon and in such case is entitled to the reasonable value of his additional services. *Hash v. R.T.[R.J.] Sundling & Son, Inc.*, 150 Mont. 388, 436 P.2d 83, 86 (1967).

114 Idaho at 710, 760 P.2d at 1126. At issue here is that portion of the above quotation that states, "The test of whether or not such contractor is entitled to additional compensation is whether or not he justifiably relied upon the plans and specifications for the construction in making his bid and entering into the contract." The district court granted a directed verdict upon the ground that the evidence did not show that Gillingham relied upon the plans and specifications in making its bid and entering into the contract.

Gillingham did not offer into evidence the plans and specifications upon which it relied in making its bid. They were marked as exhibits, however, and Gillingham had its witnesses testify generally about their contents, use them for reference during their testimony, and show them to the jury to help explain their testimony. The plans and specifications included two maps. One map, which was entitled "Site Clearing Plan," listed, among other things, the elevation above sea level of various points (spot elevations) throughout the construction site. The other map listed the finish elevation, stated in feet above sea level, of various points throughout the construction site. The quantity of dirt that Gillingham would be required to move by cutting and filling could be calculated by comparing the difference between the spot elevations as shown on the Site Clearing Plan map and the finish elevations as shown on the other map. Gillingham offered evidence showing that the spot elevations were wrong and that because the actual elevations were approximately 1¼ feet higher than as shown by the spot elevations, it was required to move more dirt than the plans and specifications indicated it would be required to move. Thus, it contends that moving that additional dirt constituted extra work[2] for which it was entitled to be paid.

Gillingham was awarded the subcontract based upon its lump-sum bid. The evidence showed that an estimator employed by Gillingham prepared that bid. Before doing so,

---

**2.** There is a difference between extra work, for which a contractor is entitled to additional compensation, and additional work, for which the contractor is not entitled to additional compensation. *Obray v. Mitchell*, 98 Idaho 533, 567 P.2d

1284 (1977). No issue has been raised regarding whether moving the extra dirt would constitute extra work or additional work, and therefore we express no opinion on that issue.

the estimator obtained the plans and specifications and viewed the construction site. The estimator did not testify during the trial, and there was no direct evidence showing that he relied upon the spot elevations in calculating the bid. Gillingham's president admitted that he did not know whether the estimator relied upon the spot elevations when preparing the bid, nor did he know how the estimator came up with the numbers reflected in the bid. The district court concluded that there was a lack of evidence showing that Gillingham actually relied upon the plans and specifications when preparing its bid. Thus, the issue is whether the evidence, including reasonable inferences that can be drawn from it, was of sufficient quantity and probative value that reasonable minds could conclude that Gillingham relied upon the plans and specifications when preparing its bid.

█ Gillingham's president testified that when preparing a bid, using the spot elevations to calculate the quantity of dirt to be moved is generally the way Gillingham's estimator always calculates bids. Evidence of the routine practice of an organization is relevant to prove that the conduct of the organization on a particular occasion was in conformity with that routine practice. IDAHO R. Evid. 406. He also testified that the only way to estimate the volume of dirt that must be moved is by calculating it based upon the existing elevations and the finish elevations as shown by the plans and specifications. The construction site was relatively flat. The jury could reasonably infer that the estimator could not have calculated the dirt to be moved simply by viewing the site. For example, if the plans required that at a particular spot the finish elevation be 2795 feet above sea level, the estimator could not, simply by viewing the site, determine how much dirt needed to be moved, either by filling or cutting, to arrive at that elevation. Finally, Gillingham's president testified that he reviewed the estimator's bid before submitting it. When doing so, he determined from the plans and specifications that Gillingham would be required to remove approximately two feet of dirt from the entire site and that the site was approximately 424,000 square feet. By multiplying these two num-

bers, he estimated the quantity of dirt that would have to be moved. Based upon that estimate, he concluded that the bid prepared by the estimator was reasonable. There was sufficient evidence from which the jury could reasonably have concluded that Gillingham relied upon the plans and specifications in calculating its bid.

█ The district court also ruled that as a matter of law Gillingham could not obtain a judgment against Newby–Wiggins because of Gillingham's settlement with the State. The district court held that because Gillingham's claim was based upon errors in the plans and specifications provided by the State, Newby–Wiggins could obtain indemnity from the State for any additional sums that it was obligated to pay Gillingham. As part of its settlement with the State, however, Gillingham agreed to indemnify the State for any sums it was required to pay on Newby–Wiggins' indemnity claim. Therefore, absent evidence showing that Gillingham was entitled to recover sums from Newby–Wiggins that it could not in turn recover from the State, Gillingham would be unable to obtain a final judgment in its favor.

Gillingham argues that it was denied the opportunity to present such additional evidence. According to Gillingham, the district court established an order for presenting proof at the trial. Gillingham was to present its evidence against Newby–Wiggins, then Newby–Wiggins would present evidence supporting its indemnity claim against the State, and then Gillingham would present evidence supporting the State's defense to Newby–Wiggins' indemnity claim. Gillingham contends that because of this order of proof, it had not yet had the opportunity to present evidence showing that Newby–Wiggins could not obtain indemnity against the State. Gillingham cannot point to any place in the record, however, showing that the district court established such order of proof.

The defense of Newby–Wiggins' indemnity claim against the State was based upon a clause in the prime contract which Gillingham contended required Newby–Wiggins to verify the elevations at the site before beginning construction. Gillingham argues that

had Newby–Wiggins done so, the error in the elevations would have been discovered and corrected before Gillingham incurred any of its additional costs. Although the prime contract was not admitted into evidence, Gillingham's president testified regarding that contract as follows:

[By Mr. Boardman, counsel for Newby–Wiggins]

Q. Okay. And is it not true that one of those [claims against Newby–Wiggins] is that my clients somehow warranted the accuracy of the plans? In layman's terms, somehow guaranteed that they were accurate?

A. Yes.

Q. Okay. How did Mr. Newby do that or anyone from Newby–Wiggins?

A. His contract with the State provides that he verifies the elevations of that site before the work starts.

. . . .

[By Mr. McCollum, counsel for Gillingham]

Q. And how do you describe it in your concept? Why do you think you ought to recover this?

A. Because it's work that I had to do, it was additional to the contract documents that I bid on, and I did it because the survey was not verified and the error was not corrected by the general contractor.

[By Mr. Boardman]

Q. Let me get this straight, Mr. Gillingham, you expected Newby–Wiggins the general contractor to correct the error?

A. I believe his contract with the owner requires him to verify the elevations before the work begins.

Q. You expected him to correct the error in the plans provided by the State?

A. No. But he should have verified them so it could be corrected and the error would have been corrected before my work started.

Gillingham contended that in its subcontract it did not assume this alleged obligation of Newby–Wiggins to verify the elevations before the work started. It argues that verifying the field elevations would require surveying, and the subcontract, which was admitted

into evidence, expressly states that Gillingham is not required to perform any surveying. On cross-examination, Gillingham's president testified that Gillingham did not assume Newby–Wiggins' obligation to verify the elevations.

The issue of whether Newby–Wiggins breached its prime contract with the State by not verifying the elevations of the site before construction began was raised by the State in its motion for summary judgment, which was argued approximately one month prior to trial. At the conclusion of the hearing, the district court denied the motion on the ground that this provision of the prime contract was ambiguous as to what it required Newby–Wiggins to do and that the meaning of the contractual provision was a question of fact to be resolved by the jury. The only evidence on this issue at trial was that of Gillingham's president, who testified that the prime contract obligated Newby–Wiggins to verify the elevations before work started. His testimony constituted substantial evidence supporting Gillingham's claim that Newby–Wiggins could not obtain indemnity from the State for all sums that Gillingham may recover, and therefore it was error for the district court to grant the directed verdict.

## C. Is Newby–Wiggins entitled to an award of attorney fees on appeal?

Newby–Wiggins has requested attorney fees on appeal pursuant to Idaho Code § 12–120(3), which mandates the award of attorney fees to the prevailing party in certain types of cases. Although Newby–Wiggins prevailed in part on this appeal, it remains to be determined which party will ultimately prevail in this lawsuit. Therefore, we do not award any attorney fees on this appeal. If the district court ultimately makes an award of attorney fees to the prevailing party, when fixing the amount of that award it may consider attorney fees incurred by the prevailing party in bringing or defending this appeal.

## III. CONCLUSION

We affirm the grant of a directed verdict dismissing Count One of the complaint. We reverse the grant of a directed verdict dis-

missing Count Two of the complaint and vacate the judgment and the award of costs and attorney fees to Newby–Wiggins. This case is remanded for further proceedings consistent with this opinion. Because each party prevailed in part on the appeal, no costs are awarded on appeal.

Chief Justice TROUT sat for oral argument but did not participate in the final decision.

Justices SCHROEDER, WALTERS and KIDWELL concur.