# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket Nos. 46247

| | |
|---|---|
| INVESTOR RECOVERY FUND, LLC, ) | |
| ) | |
|    Plaintiff-Appellant-Cross Respondent, ) | |
| ) | |
| v. ) | |
| ) | Boise, February 2020 Term |
| RANDALL H. HOPKINS, an individual; ) | |
| BRIAN MURPHY, an individual; HOPKINS ) | Opinion Filed: July 2, 2020 |
| FINANCIAL SERVICES, INC., an Idaho ) | |
| corporation, ) | Melanie Gagnepain, Clerk |
| ) | |
|    Defendants-Respondents-Cross ) | SUBSTITUTE OPINION. THE |
|    Appellants, ) | COURT'S PRIOR OPINION |
| ) | DATED APRIL 20, 2020, IS |
| and ) | HEREBY WTHDRAWN. |
| ) | |
| DOES I-V, whose true names are unknown, ) | |
| ) | |
|    Defendants. ) | |
|    _____ ) | |

Appeal from the District Court of the Fourth Judicial District of the State of Idaho, Ada County. Richard D. Greenwood, District Judge.

The district court's rulings are <u>affirmed</u> in part and <u>reversed</u> in part, the district court's amended judgment is <u>vacated</u>, and the case is <u>remanded</u>.

Angstman Johnson, Boise, for appellant. Wyatt B. Johnson argued.

Holland & Hart, PLLC, Boise, for respondents. Robert Faucher argued.

_____

BRODY, Justice.

This case addresses the applicable standard of review when considering a directed verdict in a fraud by nondisclosure case. Investor Recovery Fund, LLC is the assignee of six claims held by individual investors who lost their investments in the Hopkins Northwest Fund, LLC (the fund). Randall Hopkins and Brian Murphy were the principals of the fund, and together they owned and managed Hopkins Financial Services, Inc. (Hopkins Financial). The individual

1

investors formed Investor Recovery for the purposes of asserting a collective claim against Hopkins Financial and the fund's principals individually (collectively, Hopkins Associates). The fund declared a moratorium on redemptions in 2008, preventing investors from taking their money out of the fund. The individual investors lost their investments when the fund declared bankruptcy six years later. Investor Recovery sued Hopkins Associates, asserting claims of fraud by nondisclosure. The district court granted the principals' motion for a directed verdict after seven days of trial, concluding that Investor Recovery did not prove that the individual investors' losses were causally connected to the principals' alleged nondisclosures. We reverse the district court's directed verdict, vacate the judgment, and remand the case for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual background.

#### 1. Investor Recovery, the individual investors, and the fund

Investor Recovery is the assignee of six claims from debenture holders who lost all or part of their investments in the fund: Carol Snyder, Carol Snyder as trustee for the Van Hees Family Trust, Kellie Pugh (Carol Snyder's daughter), Bill Pugh (Kellie Pugh's husband), Larry Erickson, and Elizabeth Erickson (collectively, the "individual investors").

Randall Hopkins and Brian Murphy (together, "Hopkins and Murphy") own and operate Hopkins Financial. Hopkins is the president and majority owner. Murphy, a CPA, is the controller and a minority owner. In 2007, Hopkins Financial acted as an affiliate and contract placement manager for a number of investment funds, including the Hopkins Northwest Fund, LLC, the fund at issue in this case. In addition to their roles at Hopkins Financial, Hopkins and Murphy served as the fund's principals.

The fund operated by raising capital from investors, most of whom were individuals. The fund pooled its capital, investing in loans secured by real estate to high-risk borrowers who were not eligible to receive loans from banks. Because of the risky nature of the loans, the fund charged borrowers high interest rates, which in turn produced high yield returns. The fund distributed the resulting earned interest in profits to its investors monthly.

Individuals investing in the fund received "debentures." Holding a debenture entitled an investor to a pro-rata share of the fund's operating profit. The debentures were not publicly traded, and there was no private market for their sale. Further, the debentures were not registered with the Securities and Exchange Commission or the Idaho Department of Finance. The only

2

way investors could leave the fund with all or a portion of their debenture investment was through a "redemption" process.

The fund was governed by a private placement memorandum (PPM). Each investor was issued the PPM prior to investing in the fund. The PPM detailed investors' redemption rights. The crux of the redemption policy allowed debenture holders to redeem their debentures within 121 days, or earlier, upon providing written notice to the fund. Debenture holders' redemption rights, however, were subject to the fund's right to declare a "moratorium" on redemption requests to preserve the fund's liquidity. According to the PPM, the fund was entitled to declare a moratorium if the number of redemptions gave management concerns about the fund's liquidity or if management determined it needed to issue a new series of debentures. The relevant portion of the PPM in this case allowed management to declare a moratorium if:

> Sufficient debenture holders give notice of redemption under [the PPM] to cause Management of the [fund] to have concern for the liquidity of the [fund] and parity treatment among all debenture holders[.]

### 2. 2008 Moratorium

From the fund's inception in 2000 through the middle of 2007, the fund produced consistent high-yield returns. The fund's returns started to decline towards the end of 2007. Hopkins attributed the drop in yield to a default in one of the fund's largest loans (the "Hunter's Point loan"). The fund also experienced a general increase in loan delinquency at the end of 2007. The fund's financial troubles in late 2007 and 2008 coincided with a larger, national economic downturn. The "Great Recession" impacted real estate in the Treasure Valley and across the country. As a result, real estate prices in Idaho plummeted in 2008.

In February 2008, lower yields and recent developments in the Hunter's Point loan spurred Hopkins and Murphy to call a special meeting for all debenture holders. On February 25, 2008, Hopkins sent a letter to all debenture holders, requesting their presence at an "urgent, important[,] and special meeting that could directly affect [their] investment in [the fund]."

On February 26, 2008, Charley Williams—an investor who is not a party to this lawsuit—sent an email to Murphy inquiring about the status of a pending redemption. In response, Murphy wrote that, "I believe that all redemptions will be suspended in [the fund] on 02-28-08." This information was not shared with any other investors, and Williams submitted a redemption request withdrawing all of his money the following day. The fund paid Williams in full.

3

The special meeting occurred on February 29, 2008 (the "Leap Day meeting"). Carol Snyder, Kellie Pugh, and Betsy Erickson attended the meeting. Betsy Erickson and Kellie Pugh updated their spouses on the meeting later that evening. Hopkins and Murphy presided over the meeting, walking through a PowerPoint presentation with investors in attendance. Hopkins and Murphy also distributed a thirty-five page copy of the PowerPoint presentation for investors to take home. Hopkins and Murphy's presentation disclosed that the Hunter's Point loan—which constituted 72 percent of the fund's delinquent loans—was in judicial foreclosure. Further, the PowerPoint disclosed that one-third of the fund's current loans were not performing, meaning that they were more than thirty days past due.

During the Leap Day meeting, Hopkins and Murphy also discussed the potential for a moratorium. The PowerPoint presentation included a full slide titled, "Investor Redemptions/Potential Moratorium," and stated that, "should desired redemption requests exceed [the fund]'s available cash flow to pay those requests, this may cause [the fund] to declare a moratorium." This information essentially restated the fund's moratorium policy contained in the PPM.

Immediately following the Leap Day meeting, redemption requests spiked. Throughout the spring and summer of 2008, the fund's economic condition continued to decline. The fund eventually declared a moratorium on September 8, 2008. For those redemption requests submitted after the Leap Day meeting, only two redemption requests received their full investment back. The fund never recovered from the moratorium, and failed to honor any redemption requests after calling the September 2008 moratorium.

In 2014, the fund declared bankruptcy. The fund's approved bankruptcy plan left debenture holders with nothing. The individual investors were among the fund's investors who lost the remaining balance of their debenture investments. The individual investors testified that their collective losses totaled $1.4 million.

### 3. The alleged nondisclosures

At trial, Carol Snyder, Larry Erickson, and Bill Pugh testified that they met with Murphy, in person or over the phone, between August and December of 2007. These individual investors testified that Murphy failed to disclose that the fund was in a position to declare a moratorium. Crucially, each of these three individual investors also testified that, had Murphy raised the possibility that the fund's dwindling liquidity allowed the fund to call a moratorium at any time,

4

they would have redeemed their debentures immediately.

### B. Procedural background.

In August 2014, Investor Recovery was organized for the purpose of pursuing a claim against Hopkins Associates. Investor Recovery subsequently filed a complaint against Hopkins Associates, alleging fraud upon each of the individual investors, fraudulent transfers by Hopkins and Murphy, vicarious liability for Hopkins Financial, and civil conspiracy. Investor Recovery later amended its complaint, adding a claim for punitive damages.

After three years of litigation, the district court granted partial summary judgment, dismissing Hopkins Financial as a defendant. The district court concluded that, outside of allegations that Hopkins and Murphy aided and assisted Hopkins Financial and other affiliated entities in soliciting investment, Investor Recovery failed to produce specific evidence making Hopkins Financial liable for the alleged torts of Hopkins and Murphy.

Before trial, Hopkins and Murphy filed a motion to exclude Investor Recovery's expert witness, R. Wayne Klein. The district court held a hearing on the matter, and granted Hopkins and Murphy's motion to exclude Klein. The district court concluded that Klein's opinions were not relevant and would not aid the jury at trial.

The jury trial began on June 4, 2018. The only remaining issues at trial were fraud by nondisclosure and civil conspiracy. Investor Recovery completed its case-in-chief in seven days of trial, after which, Hopkins and Murphy moved for a directed verdict pursuant to I.R.C.P. 50(a). The district court granted the motion and entered a directed verdict for Hopkins and Murphy. The district court held that Investor Recovery failed to prove that the alleged nondisclosures caused the individual investors' injury—that is, caused them not to submit redemption requests. The district court reasoned that, even if Hopkins and Murphy failed to disclose that conditions for a moratorium existed in the individual meetings with investors, the managers disclosed the possibility of a moratorium in the Leap Day meeting. The district court further concluded that when the individual investors failed to submit redemption requests, even after Hopkins and Murphy disclosed the alleged nondisclosed fact, the causal connection between the alleged fraud and injury was severed. The district court subsequently entered a final judgment on July 2, 2018. Investor Recovery appealed.

On July 16, 2018, Hopkins Associates filed a motion for attorney fees and costs pursuant to Idaho Code sections 12-120(3) and 12-121. Investor Recovery opposed awarding any attorney

fees, arguing that neither section 12-120(3) nor 12-121 apply. The district court issued a memorandum decision and order awarding Hopkins Associates a fraction of the fees sought. The district court held that the reduced award was appropriate given duplicative efforts in the litigation, and found that only one third of the claims constituted commercial transactions under Idaho Code section 12-120(3). The district court entered an amended judgment on September 27, 2018. Hopkins Associates cross-appealed the district court's order and award of attorney fees, and Investor Recovery also challenged the district court's attorney fee award in an amended appeal.

## II.    ANALYSIS

### A. The district court erred in entering a directed verdict for Hopkins and Murphy.

#### 1. Standard of Review

"When reviewing the grant or denial of a motion for a directed verdict, we conduct an independent review of the evidence and do not defer to the findings of the trial court." *Sallaz v. Rice*, 161 Idaho 223, 226, 384 P.3d 987, 990 (2016) (citing *Gillingham Constr., Inc. v. Newby-Wiggins Constr., Inc.*, 136 Idaho 887, 891, 42 P.3d 680, 684 (2002)). Admitting the truth of the adverse evidence and drawing every reasonable inference most favorably to the opposing party, we must determine whether there exists substantial evidence to justify submitting the case to the jury. *Id.* A finding of substantial evidence does not require that the evidence be uncontradicted, or even that we find it persuasive. *Id.* Further, it does not require that we reweigh the evidence or consider the credibility of witnesses. *Id.* Rather, a finding of substantial evidence "only requires that the evidence be of sufficient quality and probative value that reasonable minds could conclude that a verdict in favor of the party against whom the motion is made is proper." *Id.* (quoting *Gillingham*, 136 Idaho at 892; 42 P.3d at 685). A directed verdict is only proper where the evidence is so clear that all reasonable minds could only reach one conclusion—that the moving party should prevail. *Id.*

Investor Recovery asserted a fraud by nondisclosure claim at trial. To prevail, it needed to prove, by clear and convincing evidence, that: (1) there was a nondisclosure; (2) the individual investors relied upon Hopkins Associates' nondisclosure; (3) the individual investors' reliance was material to the transaction; and (4) the individual investors were damaged as a proximate result of the nondisclosure. *Watts v. Krebs*, 131 Idaho 616, 619, 962 P.2d 387, 390 (1998); *see also Frontier Dev. Grp., LLC, v. Caravella*, 157 Idaho 589, 594, 338 P.3d 1193, 1198 (2014)

("Each of the elements of fraud must be established by clear and convincing evidence."). To establish a nondisclosure, there must be a duty to disclose. *Wash. Fed. Sav. v. Van Engelen*, 153 Idaho 648, 657, 289 P.3d 50, 59 (2012). A duty to disclose may arise if: (1) there is a fiduciary or similar relation of trust and confidence between the two parties; (2) it is necessary to prevent a partial statement of the facts from being misleading; or (3) a fact known by one party and not the other is so vital to the outcome that if the mistake were mutual the contract would be voidable, and, further, that the defendant knows that the plaintiff does not know the fact. *Printcraft Press, Inc. v. Sunnyside Park Utils., Inc.*, 153 Idaho 440, 453, 283 P.3d 757, 770 (2012). Whether there is a duty to disclose is a mixed question of law and fact. *Id.* Whether the circumstances, if proved, would be sufficient to give rise to a duty to disclose is a matter of law. *Id.* But once the court makes that determination, whether those circumstances were proved is a question of fact. *Id.*

### 2. The district court used the wrong standard in entering a directed verdict.

Before addressing the merits of the district court's directed verdict decision, we clarify the appropriate standard of review. The standard of review is more than just boilerplate taking up space in appellate briefs. The standard of review is critical because it, in effect, operates as the microscope through which an appellate court examines whether there was error in a proceeding. In this case, we are examining whether the district court correctly entered a directed verdict in favor of Hopkins and Murphy. Our case law makes it clear that we conduct our own independent analysis of the evidence. Before we can do that, however, it is important to articulate the correct evidentiary standard to be applied. This Court exercises free review over questions of evidentiary standards. *Turner v. Turner*, 155 Idaho 819, 823, 317 P.3d 716, 720 (2013). While we recognize that neither party raised this as an issue on appeal, "litigants' failure to address the legal question from the right perspective does not render us powerless to work the problem out properly." *Williams-Guice v. Bd. of Educ. of City of Chicago*, 45 F.3d 161, 164 (7th Cir. 1995). "Appellate review does not consist of supine submission to erroneous legal concepts even though none of the parties declaimed the applicable law below." *Empire Life Ins. Co. of Am. v. Valdak Corp.*, 468 F.2d 330, 334 (5th Cir. 1972). In this case, where we are called upon to conduct our own independent analysis of the evidence, we address the standard applied by the district court and apply the correct standard. *See id.*

To prevail at trial, Investor Recovery needed to prove all elements of its fraud claim by

*clear and convincing* evidence. *Watts*, 131 Idaho at 619, 962 P.2d at 390. However, to survive a motion for a directed verdict, Investor Recovery needed to produce *substantial* evidence of the elements in dispute. *Jordan v. Hunter*, 124 Idaho 899, 907, 865 P.2d 990, 998 (Ct. App. 1993); *see also April Beguesse, Inc. v. Rammell*, 156 Idaho 500, 509–10, 328 P.3d 480, 489–90 (2014) (holding that when reviewing a directed verdict decision in a fraud claim, this Court determines whether there was sufficient evidence to submit the claim to the jury). When the district court entered the directed verdict, it concluded that no jury could conclude by clear and convincing evidence that the alleged nondisclosures caused the investors' losses:

> The essential element of the claim is that the nondisclosure be the cause of the loss, and here *it is my finding that a jury could not conclude by clear and convincing evidence* that the nondisclosure of the management's ability to call a moratorium during the fall and winter of 2007 up through February of 2008 caused the loss.

It is evident from this statement that the district court erroneously employed the clear and convincing evidence standard rather than the substantial evidence standard that is used to evaluate a motion for directed verdict. *See Jordan*, 124 Idaho at 907, 865 P.2d at 998; *see also Bolt v. Influence, Inc.*, 43 P.3d 425, 427–29 (Or. 2002) (holding that the trial court erred using a clear and convincing evidentiary standard to review the sufficiency of the evidence). Notwithstanding this error, we conduct an independent review of the district court's directed verdict decision to determine whether Investor Recovery presented substantial evidence to submit the case to the jury. *Sallaz*, 161 Idaho at 226, 384 P.3 at 990.

### 3. Investor Recovery produced substantial evidence of causation.

The causation element is the only element of fraud at issue in this appeal. In its analysis announcing the directed verdict, the district court concluded that Investor Recovery established, for the purposes of the motion, that Hopkins and Murphy had a duty to disclose, and that there were material nondisclosures. In addressing the nondisclosure element, the district concluded that the fund failed to disclose liquidity problems that stretched from the middle of 2007 through September 2008—meaning that the fund had a right to declare a moratorium starting in the middle of 2007. The district court further concluded that the individual investors failed to make redemption requests after the fund disclosed the possibility of a moratorium in the Leap Day meeting. The district court held that, because the individual investors had the opportunity to redeem based on the Leap Day meeting information, and did not, a jury could not conclude that

8

the nondisclosures caused their loss, breaking the chain of causal connection. To be clear, the district court based its directed verdict decision on the element of causation alone. The Leap Day meeting was critical to its analysis.

On appeal, Investor Recovery asserts that although some disclosures were made during the Leap Day meeting and the materials provided, these were not sufficient to break the causal chain of connection. Rather, Investor Recovery argues that these disclosures were further fraudulent nondisclosures. We agree that a reasonable mind could conclude that a verdict in favor of Investor Recovery on the causation element would be proper.

We begin by examining the evidence of nondisclosure produced at trial. Investor Recovery produced evidence that the fund experienced liquidity concerns starting in the middle of 2007 and continuing into February 2008. Specifically, Investor Recovery introduced Hopkins' testimony from a prior bankruptcy proceeding, in which he testified: "There was a period of time mid [sic] of [2007] to when we declared the moratorium [in 2008] of navigating a restriction on cash flow and just working with people on an individual basis, as we felt we could, to navigate the storm up until we declared a moratorium[.]" Further, Investor Recovery produced evidence that the start of these cash flow problems coincided with delinquency in the Hunter's Point loan—the fund's largest loan. Thus, Investor Recovery produced evidence that the fund experienced cash flow problems in 2007, causing Hopkins and Murphy to work with investors on an individual basis to mitigate the number of redemption requests to protect cash flow, or liquidity. Under the PPM, individual investors had a right to redeem their debentures subject to management's right to call a moratorium. One of the conditions under which management could call a moratorium was "concern for the liquidity of the [fund]." Accordingly, Investor Recovery produced evidence that, starting in the middle of 2007, the fund had concerns about its liquidity, giving management the right to declare a moratorium at any time.

The fund's early liquidity concerns directly relate to the individual investors' nondisclosure claims. The individual investors, who met with Murphy individually at different times during this critical time period, testified that Murphy did not disclose that the fund's liquidity had reached a point where management could call a moratorium under the PPM. Further, the individual investors testified that, had they known that the fund was in a position to call a moratorium earlier, they would have redeemed immediately. The Leap Day meeting did not sever the chain of causation.

9

Charley Williams' testimony is critical to our analysis. At trial, Williams—a former debenture holder who is not a party to this case—testified about an email exchange between himself and Murphy that took place three days before the Leap Day meeting. Williams emailed Murphy to inquire about a pending redemption request that was coming due in early March. Murphy replied: "I believe that all redemptions will be suspended in [the fund] on 02-28-08. The size of the redemption is not the issue it is the cumulative amount of redemptions and cash availability."

The information in the Williams email is not the same as the information included in the Leap Day PowerPoint. In the Williams email, Murphy, who was the fund's controller, estimated that the fund would declare a moratorium in two days, meaning that conditions for a moratorium presently existed. Conversely, the information in the PowerPoint offered nothing more than a restatement of the moratorium policy outlined in the PPM. The urgency and imminence of the Williams email contrasts starkly with one line in a thirty-five slide PowerPoint stating that, "*should* desired redemption requests exceed [the fund]'s available cash flow to pay those requests, this *may* cause [the fund] to declare a moratorium." Put differently, projecting that a moratorium *will* occur in two days is a different message in substance and scope than the mere possibility a moratorium *could* occur should the conditions arise. Thus, we reject the district court's conclusion that the information in the Leap Day meeting and PowerPoint sufficiently revealed the alleged nondisclosures to break the chain of causation.

A reasonable mind could conclude that Hopkins and Murphy's nondisclosures were the proximate cause of the losses claimed by Investor Recovery. Williams' actions the day after receiving the email demonstrate this connection. Although Williams is not a plaintiff to this lawsuit, he held the same debentures as the individual investors in the fund. The day after he received the email from Murphy projecting that the fund was going to suspend redemptions in two days—or declare a moratorium—Williams submitted a redemption request in full. Williams received all of his money back from the fund, and was one of the last investors to receive full payment on a redemption request before the September 2008 moratorium.

In sum, the Williams email is evidence that disclosing the mere possibility of a moratorium during the Leap Day meeting was not an accurate picture of the fund's stark financial outlook, and did not sufficiently reveal the alleged nondisclosure to sever the causal connection. A reasonable mind could have concluded that the fund's failure to disclose an

imminent moratorium—like the disclosure in the Williams email—caused the individual investors' losses. Thus, we hold that Investor Recovery demonstrated substantial evidence of causation to survive a directed verdict. *Sallaz*, 161 Idaho at 226, 384 P.3 at 990.

Hopkins Associates argues that a Court of Appeals decision, *Bryant Motors, Inc. v. Am. States Ins. Co.*, 118 Idaho 796, 800 P.2d 683 (Ct. App. 1990), and a line of "holder" cases support the district court's causation conclusion. Hopkins Associates argues that the alleged harm is too speculative to the alleged nondisclosure to amount to substantial evidence of causation. We disagree. Both *Bryant Motors* and the line of holder cases cited by Hopkins Associates were missing a key piece of evidence: proof that had an alleged nondisclosure been disclosed, the plaintiff's harm could have been avoided. Here, the Williams email is that proof.

In *Bryant Motors*, the plaintiff Bryant Motors alleged that Noram American Diesel, Inc. failed to disclose that it had received payment from a school district. 118 Idaho at 797, 800 P.2d at 684. Together, the two entities built a school bus for the school district. *Id.* In its fraud claim, Bryant Motors alleged that, as a consequence of Noram's nondisclosure, it was delayed in asserting its legal rights. *Id.* at 800, 800 P.2d at 687. Bryant Motors argued that it would have taken action to protect its legal rights to avoid damages had it know that Noram received a check from the school district. *Id.* The jury returned a verdict for Bryant Motors, but the district court granted the defendant's motion notwithstanding the verdict. *Id.* at 798, 800 P.2d at 685. The Idaho Court of Appeals affirmed the district court, holding that when a plaintiff cannot prove that his inaction was causally connected to the nondisclosure, the plaintiff's claim fails. *Id.* at 800, 800 P.2d at 687. In its analysis, the Court of Appeals noted that had Noram instantaneously informed Bryant Motors of its conduct, Bryant Motors could have taken action sooner. *Id.* However, the court found that "there is no indication as to what [Bryant Motors'] endeavors would have been or what they would have yielded[.]" *Id.* The Court of Appeals further held that the record on appeal did not contain substantial evidence, other than conjecture and speculation, from which a jury could properly support a verdict for Bryant Motors. *Id.*

Here, the record on appeal *does* contain substantial evidence from which a reasonable mind could conclude that the fund's nondisclosures caused the losses. The Williams email demonstrates what a similarly situated investor did in the wake of receiving information that was not disclosed to the rest of the investors in the fund. Further, the evidence indicates that such a disclosure allowed at least one investor, Williams, to avoid losses. Thus, the Williams email is

11

the type of evidence that the Court of Appeals concluded was missing in *Bryant Motors*. As such, we do not find *Bryant Motors* persuasive in this case.

Hopkins Associates also argues that federal and sister state jurisdictions' analyses of "holder claims" support the district court's directed verdict on causation. Hopkins Associates equate Investor Recovery's fraud by nondisclosure claims to holder claims. A holder claim is an action in which the plaintiff investor alleges that after he retained, rather than sold, his security because of material misinformation the defendant provided or neglected to reveal about the issuer, the price of his securities substantially dropped. Edward T. McDermott, *Holder Claims– Potential Causes of Action in Delaware and Beyond?*, 41 Del. J. Corp. L. 933, 934 (2017); *see AHW Inv. P'ship v. Citigroup Inc.*, 980 F. Supp. 2d 510, 514 (S.D.N.Y. 2013). Holder claims are asserted as common law fraud or negligent misrepresentation claims. McDermott, *supra*, at 934; *see also Citigroup*, 980 F. Supp. 2d at 514 ("Plaintiffs raise common law claims of negligent misrepresentation and fraud that take the form or what are referred to as 'holder' claims[.]"). Critics argue that holder claims "lack essential elements of fraudulent and negligent misrepresentation claims and thus are categorically without merit." McDermott, *supra*, at 948. In particular, holder claims are attacked for their incomplete account of the causal relationship between the defendant's misconduct and the allegedly resultant damages. McDermott, *supra*, at 942.

Hopkins Associates argues that many courts dismiss holder claims when the plaintiff's claims are too speculative or fail to prove causation. *See Arent v. Distrib. Sci., Inc.*, 975 F.2d 1370, 1372 (8th Cir. 1992) (affirming the dismissal of a holder claim because the plaintiff's harm was caused by a valueless company rather than the defendant's nondisclosure); *WM High Yield Fund v. O'Hanlon*, No. 04-3423, 2005 WL 6788466, at \*2, \*13 (E.D. Pa. May 13, 2015) (holding that the plaintiff's damages resulted from disclosures of accurate information and its effect on the market rather than the alleged nondisclosure). While Investor Recovery's claims are akin to holder claims, the facts supporting Investor Recovery's claims are not speculative like those exhibited in the holder claim cases cited by Hopkins Associates. As noted above, the Williams email is concrete evidence that a similarly situated investor avoided the harm alleged by the individual investors when given nondisclosed information. Thus, this case does not suffer the same speculation malady exhibited in holder claims. As such, we reverse the district court's directed verdict and vacate the district court's judgment.

12

**B. The district court did not abuse its discretion in excluding R. Wayne Klein's testimony.**

### 1. Standard of Review

We review the district court's decision to exclude expert testimony for abuse of discretion. *Thurston Enters., Inc. v. Safeguard Bus. Sys. Inc.*, 164 Idaho 709, 716, 435 P.3d 489, 496 (2019). Error is "disregarded unless the ruling is a manifest abuse of the trial court's discretion and affects a substantial right of the party." *Id.* (quoting *Perry v. Magic Valley Reg'l Med. Ctr.*, 134 Idaho 46, 50–51, 995 P.2d 816, 820–21 (2000)). When reviewing for abuse of discretion, this Court considers whether the trial court (1) perceived the issue as one of discretion, (2) acted within the outer boundaries of that discretion, (3) acted consistently with the legal standards applicable to the specific choices available to it, and (4) reached its decision by an exercise of reason. *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 195 (2018).

The admissibility of expert testimony is governed by Idaho Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

I.R.E. 702.

### 2. The district court did not err in ruling that Klein's testimony would not assist the jury.

Investor Recovery contends that the district court abused its discretion in excluding Klein's expert testimony from trial. From the record, it is undisputed that Klein is a securities expert. Notwithstanding his securities expertise, Investor Recovery sought to introduce his testimony for a broader range of topics, including Hopkins and Murphy's duty to disclose, the materiality of their alleged nondisclosures, and extreme deviations under securities laws to justify an award of punitive damages. In granting Hopkins and Murphy's motion to exclude Klein, the district court precluded Klein from testifying in four areas: (1) securities law and the securities industry's duty to disclose; (2) materiality; (3) reliance; and (4) punitive damages. The district court held that, because Klein's testimony would not bear on the elements of common law fraud, his testimony would not aid the jury in reaching its decision on the issues before them.

Crucially, on appeal, Investor Recovery limits its challenge to the issue of materiality. Investor Recovery argues that the district court "exceeded the outer boundaries of its discretion"

13

because it deemed Klein's securities expertise irrelevant to issues of common law fraud. Additionally, Investor Recovery argues that the trial court's analysis was not consistent with the legal standards applicable because Klein's testimony is relevant to the materiality of the alleged nondisclosures.

As a preliminary matter, we note that Investor Recovery misconstrues the district court's holding on materiality. Investor Recovery contends that Klein's testimony on the securities industry is relevant to the issue of materiality because Hopkins and Murphy operate in the securities industry. However, the district court did not preclude Klein from testifying on materiality on relevance grounds, rather the district court held that Klein would not help the trier of fact in determining materiality. The district court concluded that "a jury is completely capable of reaching their own conclusions about what was going on and what was material" without Klein's testimony. Thus, the district court precluded Klein's testimony on materiality under I.R.E. 702 rather than I.R.E. 401. Accordingly, we review the district court's I.R.E. 702 ruling for an abuse of discretion. *Thurston Enters.*, 164 Idaho at 716, 435 P.3d at 496.

Pursuant to the Idaho Rules of Evidence, an expert witnesses may testify in the form of an opinion or otherwise if his specialized knowledge will help the trier of fact understand the evidence or to determine a fact in issue. I.R.E. 702. Idaho's common law, rather than federal or state securities law, controls whether an alleged nondisclosure is material. *See Watts*, 131 Idaho at 619–20, 962 P.2d at 390–91. The test for materiality is both objective and subjective. *Id.* at 620, 962 P.2d at 391. A nondisclosure is objectively material if "a reasonable man would attach importance to its existence or nonexistence in deterring his choice of action in the transaction in question," and subjectively material if "the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action." *Id.*

The district court did not abuse its discretion in excluding Klein's testimony. The trial court determines whether to admit or refuse an expert's testimony. *Perry*, 139 Idaho at 523, 81 P.3d at 1233. Thus, the district court acted within the boundaries of its discretion in determining that the proposed testimony would not help the jury determine the issue of materiality. Further, the district court acted within the applicable legal standards. Idaho's common law fraud defines materiality without any reference to securities laws. *See Watts*, 131 Idaho at 619–20, 962 P.2d at 390–91. The district court appropriately concluded that the jury could determine the issue of

14

materiality without an opinion on securities law and the expectations of the securities industry. Klein's testimony would not bear on the objective value that an investor would place on the disclosures because the objective standard uses a reasonable person standard. *See id.* at 620, 962 P.2d at 391. Analyzing whether a reasonable person would find the information material to their investment does not require a securities industry perspective. Further, the expert testimony does not bear on the subjective materiality of the disclosures either. While the debentures themselves are likely a form of a security, the PPM expressly states that the fund is not registered with state or federal securities agencies. Thus, the district court's conclusion that the jury did not need the aid of a securities expert to understand common law materiality was within its discretion. Accordingly, the district court did not abuse its discretion in excluding Klein's testimony.

### C. The district court did not err in granting Hopkins Financial summary judgment.

#### 1. Standard of Review

We apply the same standard of review used by the trial court in ruling on a motion for summary judgment. *Thurston*, 164 Idaho at 716, 435 P.3d at 496. Summary judgment is proper if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." I.R.C.P. 56(a). In making this determination, we construe all disputed facts and make all reasonable inferences that can be drawn from the record in favor of the non-moving party. *Thurston*, 164 Idaho at 716, 435 P.3d at 496. A "mere scintilla of evidence or only a slight doubt as to the facts is insufficient to withstand summary judgment." *Franklin Bldg. Supply Co. v. Hymas*, 157 Idaho 632, 637, 339 P.3d 357, 362 (2014) (quoting *Corbridge v. Clark Equip. Co.*, 112 Idaho 85, 87, 730 P.2d 1005, 1007 (1986)).

#### 2. Investor Recovery failed to show a genuine dispute of material fact regarding Hopkins Financial.

Investor Recovery contends that the district court erred in entering summary judgment for Hopkins Financial. The district court granted summary judgment for Hopkins Financial, concluding that Investor Recovery failed to produce any evidence that Hopkins Financial participated in the allegations beyond their role defined in the PPM.

On appeal, Investor Recovery argues that the district court erred in failing to construe disputed facts in its favor. Specifically, Investor Recovery asserts that whether communications sent to investors were on behalf of the fund or Hopkins Financial was a disputed fact. In support of this argument, Investor Recovery cites to multiple communications pertaining to the fund sent

15

to the individual investors on Hopkins Financial's letterhead. Further, Investors Recovery bases its claim of vicarious liability on an agency theory. Investor Recovery asserts that Hopkins and Murphy were Hopkins Financial's agents, acting with apparent authority to bind Hopkins Financial. We disagree.

Investor Recovery's argument and the facts supporting it do not raise a genuine issue of material fact. Investor Recovery directs this Court to several pages of alleged undisputed facts in the record that it argues create an issue of material fact regarding Hopkins and Murphy's work in both the fund and Hopkins Financial. However, Investor Recovery's opposition to Hopkins Associates' motion for summary judgment on this issue did not cite to any of the deposition testimony or evidence presented on appeal. Instead, Investor Recovery relies on its briefing to this Court, and portions of Hopkins and Murphy's depositions without specific record citations.

The "trial court is not required to search the record looking for evidence that may create a genuine issue of material fact; the party opposing the summary judgment is required to bring that evidence to the court's attention." *Valiant Idaho, LLC v. VP Inc.*, 164 Idaho 314, 328, 429 P.3d 855, 869 (2018) (quoting *Esser Elec. v. Lost River Ballistics Techs., Inc.*, 145 Idaho 912, 919, 188 P.3d 854, 861 (2008)). Here, Investor Recovery failed to bring the evidence that it now relies upon on appeal to the district court's attention in its opposition to Hopkins Associates' summary judgment motion. Accordingly, the district court did not err in failing to construe disputed facts in Investor Recovery's favor.

Investor Recovery's vicarious liability argument based on agency also fails. In opposition to summary judgment below, and in this appeal, Investor Recovery seeks to hold Hopkins Financial liable through the acts of its agents—Hopkins and Murphy—based on apparent authority. Investor Recovery argues that Hopkins and Murphy "were agents with apparent authority to bind [Hopkins Financial]. This arises from the fact that they were the owners and controlling employees of Hopkins Financial." Even accepting that Hopkins and Murphy were Hopkins Financial's agents, Investor Recovery's argument is still meritless.

Apparent authority is "the power held by an agent or other actor to affect a principal's legal relationship with third parties when a third party reasonably believes the actor has the authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." *Jones v. HealthSouth Treasure Valley Hosp.*, 147 Idaho 109, 113–14, 206 P.3d 473, 477–78 (2009) (quoting *Restatement (Third) of Agency*, § 2.03 (2006)). In opposition below

16

and on appeal, Investor Recovery failed to produce any evidence that the *individual investors reasonably believed* that their interactions with Hopkins and Murphy were on behalf of Hopkins Financial instead of the fund. Instead, Investor Recovery's arguments focus exclusively on Hopkins and Murphy's alleged actions and their respective roles within both entities. Investor Recovery included one line in its Amended Complaint, stating that "[t]he assignors of claims to Investor Recovery reasonably believed that the acts and omissions of [Hopkins and Murphy] referenced in this complaint were on behalf of Hopkins Financial." Despite this conclusory allegation, Investor Recovery failed to allege any facts, evidence, or argument regarding the individual investors' reasonable belief about their interactions with Hopkins and Murphy in its opposition to summary judgment. Rather, Investor Recovery cites to documents in the record that were sent to the individual investors regarding their debentures in the fund on Hopkins Financial's letterhead. As noted above, however, these facts were not provided to the district court to consider in ruling on summary judgment. In fact, the documents that Investor Recovery cites to are mostly trial exhibits, which the district court could not have considered at the time it ruled on this summary judgment motion. In its reply brief, Investor Recovery admitted that "not all of the trial exhibits were before the trial court on summary judgment." Further, other than stating that these documents exist in the record, Investor Recovery failed to connect them to any evidence of their impact on the individual investors' reasonable beliefs. Thus, Investor Recovery failed to demonstrate a genuine dispute of material fact. Accordingly, the district court did not err in granting Hopkins Financial summary judgment.

### D. We vacate the district court's attorney fee award.

After Hopkins and Murphy received a directed verdict, Hopkins Associates filed a motion for $948,932.83 in attorney fees and costs. The district court ultimately awarded Hopkins Associates $160,211 in attorney fees and costs. In reaching this total, the district court first held that Hopkins Associates was entitled to an award of attorney fees under Idaho Code section 12-120(3). Pursuant to its discretion under Idaho Rule of Civil Procedure 54(e), the district court concluded that the total fee requested was not reasonable and awarded Hopkins Associates approximately half of the attorney fees requested, $450,000. The district court then determined that of that $450,000, only one-third of it was attributable to commercial transactions under Idaho Code section 12-120(3).

Hopkins Associates filed a cross-appeal, challenging the district court's conclusions

17

under Idaho Code 12-120(3) and I.R.C.P. 54(e). Investor Recovery amended its initial notice of appeal, arguing that Idaho Code section 12-120(3) does not apply to any of Investor Recovery's claims.

Idaho Code section 12-120(3) only provides an award of attorney fees for a prevailing party. *Howard v. Perry*, 141 Idaho 139, 143, 106 P.3d 465, 469 (2005). Because we vacate the district court's judgment, we also vacate the district court's attorney fee award. At present, there is no prevailing party. *Id.* This Court has refused to address an attorney fee award under Idaho Code section 12-120(3) when there is no prevailing party. *Id.* Thus, we will not address the district court's conclusions under Idaho Code section 12-120(3) and I.R.C.P. 54(e) in this appeal. On remand, the district court will determine: (1) the prevailing party; and (2) whether the gravamen of the lawsuit involved a commercial transaction pursuant to Idaho Code section 12-120(3). *First Bank of Lincoln v. Land Title of Nez Perce Cnty., Inc.*, 165 Idaho 813,___, 452 P.3d 835, 846 (2019); *Portfolio Recovery Assocs., LLC v. MacDonald*, 162 Idaho 228, 236, 395 P.3d 1261, 1269 (2017).

### E. Attorney fees for this appeal

Both parties seek attorney fees for this appeal. As stated above, there is no present prevailing party in this case. If either party prevails upon remand and the district court determines that the gravamen of this suit constitutes a commercial transaction, the district court may award attorney fees for this appeal. *See Portfolio Recovery Assocs.*, 162 Idaho at 236, 395 P.3d at 1269.

## III.    CONCLUSION

In light of the foregoing, we reverse the district court's directed verdict for Hopkins and Murphy. We vacate the district court's amended judgment dismissing Investor Recovery's claims and awarding attorney fees and remand the case for further proceedings consistent with this opinion. Further, we hold that the district court did not err in excluding Investor Recovery's expert witness at trial, nor did it err in granting Hopkins Financial summary judgment. Attorney fees for this appeal may be awarded by the district court as set forth above. No costs are awarded on appeal.

Chief Justice BURDICK, and Justices BEVAN, STEGNER, and MOELLER CONCUR.